IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　Plaintiff,<br><br>v.<br><br>CITY OF DETROIT, MICHIGAN<br>and the DETROIT POLICE<br>DEPARTMENT,<br><br>　　　　Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

No. **03 - 72258**

HON. JULIAN ABELE COOK

MAGISTRATE JUDGE SCHEER

**Consent Judgment**
**Use of Force and Arrest and Witness Detention**

U.S. DIST. COURT CLERK
EAST DIST. MICH
DETROIT

'03 JUL 18 P4:09

FILED

# Table of Contents

I.    DEFINITIONS........................................  1

II.   GENERAL PROVISIONS.................................  5

III.  USE OF FORCE POLICY................................  7
      A.  *General Use of Force Policies*................  7
      B.  *Use of Firearms Policy*.......................  8
      C.  *Intermediate Force Device Policy*.............  8
      D.  *Chemical Spray Policy*........................  9

IV.   INCIDENT DOCUMENTATION, INVESTIGATION, AND REVIEW.  9
      A.  *General Investigations of Police Action*......  9
      B.  *Use of Force and Prisoner Injury Investigations*... 12
      C.  *Review of Critical Firearm Discharges and*.... 13
          *In-Custody Deaths*

V.    ARREST AND DETENTION POLICIES AND PRACTICES....... 14
      A.  *Arrest Policies*.............................. 14
      B.  *Investigatory Stop Policies*.................. 14
      C.  *Witness Identification and Questioning Policies*... 14
      D.  *Prompt Judicial Review Policies*.............. 15
      E.  *Hold Policies*................................ 16
      F.  *Restriction Policies*......................... 16
      G.  *Material Witness Policies*.................... 16
      H.  *Documentation of Custodial Detention*......... 17
      I.  *Command Notification*......................... 17

VI.   EXTERNAL COMPLAINTS............................... 17
      A.  *Intake and Tracking*.......................... 18
      B.  *External Complaint Investigation*............. 19

VII.  GENERAL POLICIES................................. 20

VIII. MANAGEMENT AND SUPERVISION....................... 22
      A.  *Risk Management Database*..................... 22
      B.  *Performance Evaluation System*................ 28
      C.  *Oversight*.................................... 28
      D.  *Use of Video Cameras*......................... 29
      E.  *Discipline*................................... 30

IX.   TRAINING......................................... 30
      A.  *Oversight and Development*.................... 30
      B.  *Use of Force Training*........................ 32
      C.  *Firearms Training*............................ 33
      D.  *Arrest and Police-Citizen Interaction Training*.... 33
      E.  *Custodial Detention Training*................. 34
      F.  *Supervisory Training*......................... 34
      G.  *Investigator Training*........................ 35

       H.   *Field Training*.....................................35

X.     **MONITORING, REPORTING, AND IMPLEMENTATION**...........35
       A.   *Selection of the Monitor*.........................35
       B.   *Duties of the Monitor*...........................37
       C.   *Compliance Reviews*..............................39
       D.   *Reports and Records*.............................40
       E.   *Implementation, Termination, and Enforcement*......41
       F.   *Miscellaneous*...................................42

## I.   DEFINITIONS

1.   As used in this Agreement:

a.   The term "actively resisting" means the subject is making physically evasive movements to defeat an officer's attempt at control, including bracing, tensing, pulling away, or pushing.

b.   The term "arrest" means a seizure of greater scope or duration than an investigatory or Terry stop.  An arrest is lawful when supported by probable cause.

c.   The term "auditable form" or "auditable log" means a discrete record of the relevant information maintained separate and independent of blotters and other forms maintained by the DPD.

d.   The term "canine apprehension" means any time a canine is deployed and plays a clear and well-documented role in the capture of a person.  The mere presence of a canine at the scene of an arrest shall not be counted as an apprehension.

e.   The term "canine bite ratio" means the number of apprehensions accomplished by means of a dog bite divided by the total number of apprehensions (both with and without a bite).

f.   The term "canine deployment" means any situation, except in cases involving an on-leash article search only, in which a canine is brought to the scene and either:  i) the canine is released from the police car in furtherance of the police action; or ii) the suspect gives up immediately after an announcement is made that if he/she does not surrender the canine will be released.

g.   The term "City" means the City of Detroit, including its agents, officers and employees.

h.   The term "Collective Bargaining Agreements" means the labor agreements by and between the City and the Detroit Police Officers Association, the Detroit Police Lieutenants and Sergeants Association, the Detroit Police Command Officers Association, the Police Officer Labor Council, and Local 2394 of the American Federation of State, County, and Municipal Employees in effect on the effective date of this Agreement.

1

i.  The term "command investigation" means an investigation conducted by a DPD officer's or employee's supervisor.

j.  The term "complaint" means an allegation from any source of any misconduct by DPD personnel.

k.  The term "conveyance" means any instance when the DPD transports a non-DPD employee for any purpose.

l.  The term "critical firearm discharge" means each discharge of a firearm by a DPD officer with the exception of range and training discharges and discharges at animals.

m.  The term "DOJ" means the United States Department of Justice and its agents and employees.

n.  The term "DPD" means the Detroit Police Department, its agents and its employees (both sworn and unsworn).

o.  The term "DPD unit" means any officially designated organization of officers within the DPD, including precincts and specialized units.

p.  The term "discipline" means a written reprimand, suspension, demotion or dismissal.

q.  The term "effective date" means the day this Agreement is entered by the Court.

r.  The term "escorting" means the use of light physical pressure to guide a person, or keep a person in place.

s.  The term "FTO" means a field training officer.

t.  The term "force" means the following actions by an officer: any physical strike or instrumental contact with a person; any intentional attempted physical strike or instrumental contact that does not take effect; or any significant physical contact that restricts the movement of a person. The term includes the discharge of firearms; the use of chemical spray, choke holds or hard hands; the taking of a subject to the ground; or the deployment of a canine. The term does not include escorting or handcuffing a person, with no or minimal resistance. Use of force is lawful if it is objectively reasonable under the circumstances and the minimum amount of force necessary to effect an arrest or protect the officer or other person.

2

u.   The term "hard hands" means using physical pressure to force
     a person against an object or the ground, or the use of
     physical strength or skill that causes pain or leaves a
     mark.

v.   The term "hold" means any outstanding charge(s) or
     warrant(s) other than those which serve as the predicate for
     the current arrest.

w.   The term "IAD" means the section of the DPD that
     investigates serious uses of force and allegations of
     criminal misconduct by DPD employees.

x.   The term "including" means "including, but not limited to."

y.   The term "injury" means any impairment of physical condition
     or pain.

z.   The term "investigatory stop," or "Terry stop," means a
     limited seizure.  An investigatory stop is lawful when
     supported by reasonable suspicion and narrowly tailored in
     scope and duration to the reasons supporting the seizure.

aa.  The term "material witness" means a witness subpoenaed to
     testify in a criminal case.

bb.  The term "misconduct" means any conduct by a DPD employee
     that violates DPD policy or the law.

cc.  The term "non-disciplinary corrective action" means
     counseling, training or other action apart from discipline
     taken by a DPD supervisor to enable or encourage an officer
     to modify or improve his or her performance.

dd.  The term "OCI" means the Office of the Chief Investigator,
     which has responsibility for investigating external
     complaints.

ee.  The term "parties" means the DOJ, the City and the DPD.

ff.  The term "police officer" or "officer" means any law
     enforcement officer employed by the DPD, including
     supervisors.

gg.  The term "prisoner injury" means an injury, or complaint of
     injury, that occurs in the course of taking or after an
     individual was taken into DPD custody that is not attributed
     to a use of force by a DPD employee.

hh.   The term "probable cause" means a reasonable belief that an individual has committed, is committing, or is about to commit an offense.

ii.   The term "prompt judicial review" means the presentment of an arrestee before a court of appropriate jurisdiction for a probable cause determination as soon after an arrest as is reasonably feasible.  A reasonably feasible time period is the period of time necessary to schedule the arraignment and complete the administrative processing of the arrestee and shall not exceed 48 hours of the arrest, absent extraordinary circumstances.

jj.   The term "proper use of force decision making" means the use of reasonable force, including proper tactics, and de-escalation techniques.

kk.   The term "reasonable suspicion" means the specific facts and reasonable inferences drawn from those facts to convince an ordinarily prudent person that criminality is at hand.

ll.   The term "seizure," or "detention," means any restriction on the liberty interest of an individual.  A seizure occurs when an officer's words or actions convey to a reasonable person that he or she is not free to leave.

mm.   The term "serious bodily injury" means an injury that involves a loss of consciousness, extreme physical pain, protracted and obvious disfigurement, protracted loss or impairment of the function of a body part or organ, or a substantial risk of death.

nn.   The term "serious use of force" means any action by a DPD officer that involves:  i) the use of deadly force, including all critical firearms discharges; ii) a use of force in which the person suffers serious bodily injury or requires hospital admission; iii) a canine bite; and iv) the use of chemical spray against a restrained person.

oo.   The term "shall" means that the provision imposes a mandatory duty.

pp.   The term "supervisor" means a sworn DPD employee at the rank of sergeant or above and non-sworn employees with oversight responsibility for DPD employees.

4

## II.  GENERAL PROVISIONS

2.  This Agreement is effectuated pursuant to the authority
    granted the DOJ under the Violent Crime Control and Law
    Enforcement Act of 1994, 42 U.S.C. § 14141 ("Section
    14141"), to seek declaratory or equitable relief to remedy a
    pattern or practice of conduct by law enforcement officers
    that deprives individuals of rights, privileges or
    immunities secured by the Constitution or federal law.

3.  In its Complaint, the United States alleges that the City
    and the DPD are engaging in a pattern or practice of
    unconstitutional or otherwise unlawful conduct that has been
    made possible by the failure of the City and the DPD to
    adopt and implement proper management practices and
    procedures.

4.  This Court has jurisdiction of this action under 28 U.S.C.
    §§ 1331 and 1345.  Venue is proper in the Eastern District
    of Michigan pursuant to 28 U.S.C. § 1391.

5.  This Agreement resolves all claims in the United States'
    Complaint filed in this case concerning allegations of a
    pattern or practice of conduct resulting in unconstitutional
    or otherwise unlawful uses of force and arrest and detention
    practices by the DPD in violation of 42 U.S.C. § 14141.  The
    DOJ, the City and the DPD have resolved the DOJ's claims
    regarding the conditions of confinement in DPD holding cells
    in a separate Agreement, to be filed concurrently with this
    Complaint and Agreement with the United States District
    Court for the Eastern District of Michigan.

6.  In September 2000, the Mayor of Detroit and other interested
    persons requested that the DOJ review the DPD's use of
    force.  This request indicated the City's commitment to
    minimizing the risk of excessive use of force in the DPD and
    to promoting police integrity.  Based, in part, on these
    requests, the DOJ initiated an investigation in December
    2000, of the use of force and conditions in DPD holding
    cells pursuant to its authority under Section 14141.  The
    investigation was expanded in May 2001, to include the DPD's
    arrest and detention policies and practices.

7.  DOJ's investigation was conducted with the full cooperation
    of the City.  During the investigation, in keeping with the
    Attorney General's pledge to provide technical assistance,
    the DOJ made recommendations for changes in the DPD's
    policies and procedures regarding use of force, conditions
    in DPD holding cells, and arrest and detention in the form

5

of three technical assistance letters of March 6, 2002,
April 4, 2002 and June 5, 2002, several meetings with the
Chief of Police and DPD command staff regarding the
substance of the technical assistance letters, and
participation in working groups created by the DPD to
facilitate reform. The DPD is currently in the process of
revising its policies and procedures to address the issues
identified by the DOJ. The DOJ and the City believe this
Agreement, rather than contested litigation, represents the
best opportunity to address the DOJ's concerns.

8. Nothing in this Agreement is intended to alter the lawful
authority of the DPD to use reasonable and necessary force,
effect arrests and file charges, conduct searches or make
seizures, or otherwise fulfill its law enforcement
obligations in a manner consistent with the requirements of
the Constitutions and laws of the United States and the
State of Michigan.

9. Nothing in this Agreement is intended to alter the
Collective Bargaining Agreements or impair the collective
bargaining rights of employees under State and local law.
Nothing in this Agreement is intended to amend or supercede
any provision of State or local law, including the City
Charter. The DOJ and the City have attempted to draft this
Agreement to avoid impairing the rights of the Detroit
Police Officers Association, the Detroit Police Lieutenants
and Sergeants Association, the Detroit Police Command
Officers Association, the Police Officer Labor Council, and
Local 2394 of the American Federation of State, County, and
Municipal Employees under the Collective Bargaining
Agreements. However, a determination that any such right is
impaired shall not excuse the City and the DPD from a
failure to implement any provision of this Agreement.

10. This Agreement shall constitute the entire integrated
agreement of the parties regarding use of force and arrest
and detention practices. With the exception of the
technical assistance letters described in paragraph 7, no
prior drafts or prior or contemporaneous communications,
oral or written, shall be relevant or admissible for
purposes of determining the meaning of any provisions herein
in any litigation or any other proceeding.

11. This Agreement is binding upon the parties, by and through
their officials, agents, employees, and successors. The
parties are interested in providing clear lines of
authority: In the event of a dispute among officials,
agents, employees, or agencies of the City, the Mayor of

6

Detroit is the final authority on behalf of the City as it pertains to this Agreement. This Agreement is enforceable only by the parties. No person or entity is intended to be a third-party beneficiary of the provisions of this Agreement for purposes of any civil, criminal, or administrative action, and accordingly, no person or entity may assert any claim or right as a beneficiary or protected class under this Agreement. This Agreement is not intended to impair or expand the right of any person or organization to seek relief against the City or its officials, employees or agents for their conduct or the conduct of DPD officers; accordingly, it does not alter legal standards governing any such claims, including those under Michigan law. This Agreement does not authorize, nor shall it be construed to authorize, access to any City, DPD or DOJ documents by persons or entities other than the Court, the DOJ, the City, and the Monitor.

12. The City is responsible for providing necessary support to the DPD to enable it to fulfill its obligations under this Agreement.

13. The City, by and through its officials, agents, employees and successors, is enjoined from engaging in a pattern or practice of conduct by employees of the DPD that deprives persons of rights, privileges, or immunities secured or protected by the Constitution or laws of the United States.

## III. USE OF FORCE POLICY

A. General Use of Force Policies

14. The DPD shall revise its use of force policies to define force as that term is defined in this Agreement.

15. The use of force policy shall incorporate a use of force continuum that:

   a. identifies when and in what manner the use of lethal and less than lethal force are permitted;
   b. relates the force options available to officers to the types of conduct by individuals that would justify the use of such force; and
   c. states that de-escalation, disengagement, area containment, surveillance, waiting out a subject, summoning reinforcements or calling in specialized units are often the appropriate response to a situation.

7

16. The use of force policy shall reinforce that individuals should be provided an opportunity to submit to arrest before force is used and provide that force may be used only when verbal commands and other techniques that do not require the use of force would be ineffective or present a danger to the officer or others.

17. The use of force policy shall prohibit the use of choke holds and similar carotid holds except where deadly force is authorized.

18. The DPD shall develop a revised use of force policy within three months of the effective date of this Agreement. The policy shall be submitted for review and approval of the DOJ. The DPD shall implement the revised use of force policy within three months of the review and approval of the DOJ.

19. The use of force policy shall provide that a strike to the head with an instrument constitutes a use of deadly force.

B. Use of Firearms Policy

20. The DPD shall revise its use of firearms policies to provide that officers must successfully qualify with their department-issued firearm and any other firearm they are authorized to use or carry on-duty on a bi-annual basis, as described in paragraph 113.

21. Officers who fail to re-qualify shall be relieved of police powers and relinquish immediately all department-issued firearms. Those officers who fail to re-qualify after remedial training within a reasonable time shall be subject to disciplinary action, up to and including a recommendation for termination of employment.

22. The firearm policy shall prohibit firing at or from a moving vehicle. The policy shall also prohibit officers from intentionally placing themselves in the path of a moving vehicle.

23. The DPD shall identify a limited selection of authorized ammunition and prohibit officers from possessing or using unauthorized firearms or ammunition. The DPD shall specify the number of rounds DPD officers shall carry.

C. Intermediate Force Device Policy

24. The DPD shall select an intermediate force device, which is between chemical spray and firearms on the force continuum,

that can be carried by officers at all times while on-duty.
The DPD shall develop a policy regarding the intermediate
force device, incorporate the intermediate force device into
the force continuum and train all officers in its use on an
annual basis.

D.   Chemical Spray Policy

25.   The DPD shall revise its chemical spray policy to require
officers to:

   a.   provide a verbal warning and time to allow the subject
        to comply prior to the use of chemical spray, unless
        such warnings would present a danger to the officer or
        others;
   b.   provide an opportunity for decontamination to a sprayed
        subject within twenty minutes of the application of the
        spray or apprehension of the subject;
   c.   obtain appropriate medical assistance for sprayed
        subjects when they complain of continued effects after
        having been de-contaminated or they indicate that they
        have a pre-existing medical condition (e.g., asthma,
        emphysema, bronchitis or heart ailment) that may be
        aggravated by chemical spray and if such signs are
        observed the subject shall be immediately conveyed to a
        local hospital for professional medical treatment; and
   d.   obtain the approval of a supervisor any time chemical
        spray is used against a crowd.

26.   The DPD shall prohibit officers from using chemical spray on
a handcuffed individual in a police vehicle.  The DPD shall
also prohibit officers from keeping any sprayed subject in a
face down position, in order to avoid positional asphyxia.

IV.   INCIDENT DOCUMENTATION, INVESTIGATION, AND REVIEW

A.   General Investigations of Police Action

27.   The DPD and the City shall revise their policies regarding
the conduct of all investigations to ensure full, thorough
and complete investigations.  All investigations shall, to
the extent reasonably possible, determine whether the
officer's conduct was justified and the DPD and the City
shall prohibit the closing of an investigation being
conducted by the DPD and/or the City simply because a
subject or complainant is unavailable, unwilling or unable
to cooperate, including a refusal to provide medical records
or proof of injury.

28.   The DPD and the City shall ensure that investigations are
conducted by a supervisor who did not authorize, witness or

9

participate in the incident and that all investigations contain:

   a.  documentation of the name and badge number of all officers involved in or on the scene during the incident and a canvass of the scene to identify civilian witnesses;

   b.  thorough and complete interviews of all witnesses, subject to paragraph 31 below and an effort to resolve material inconsistencies between witness statements;

   c.  photographs of the subject's(s') and officer's(s') injuries or alleged injuries; and

   d.  documentation of any medical care provided.

29.  The DPD and the City shall revise their procedures for all investigatory interviews to require:

   a.  officers who witness or are involved in an incident to provide a timely statement regarding the incident (subject to paragraph 31 below);

   b.  whenever practicable and appropriate, interviews of complainants and witnesses be conducted at sites and times convenient for them, including at their residences or places of business; and

   c.  that all IAD, OCI and Critical Firearm Discharge Investigations shall also include in-person video or audio tape-recorded interviews of all complainants, witnesses, and involved DPD officers and prohibit group interviews.  In cases where complainants/witnesses refuse in-person video or audio tape recorded interviews, written statements shall be taken and signed by the complainant/witness along with a signed refusal statement by the complainant/witness.

30.  The DPD and the City procedures for all investigatory interviews shall prohibit:

   a.  the use of leading questions that improperly suggest legal justifications for the officer's(s') actions when such questions are contrary to appropriate law enforcement techniques; and

   b.  the use of interviews via written questions when it is contrary to appropriate law enforcement techniques.

31.  The DPD and the City shall develop a protocol for when statements should (and should not) be compelled pursuant to Garrity v. New Jersey, 385 U.S. 493 (1967).

32.  The DPD shall revise its policies regarding all investigatory reports and evaluations to require:

a.   a precise description of the facts and circumstances of the incident, including a detailed account of the subject's(s') or complainant's(s')and officer's(s') actions and an evaluation of the initial stop or seizure;

b.   a review of all relevant evidence, including circumstantial, direct and physical evidence;

c.   that the fact that a subject or complainant pled guilty or was found guilty of an offense shall not be considered as evidence of whether a DPD officer engaged in misconduct, nor shall it justify discontinuing the investigation;

d.   reasonable credibility determinations, with no automatic preference given to an officer's statement over a non-officer's statement or discounting of a witness's statement merely because the witness has some connection to the subject or complainant;

e.   an evaluation of whether an officer complied with DPD policy;

f.   an evaluation of all uses of force, including the officer's tactics, and any allegations or evidence of misconduct uncovered during the course of the investigation;

g.   all administrative investigations to be evaluated based on a preponderance of the evidence standard;

h.   written documentation of the basis for extending the deadline of a report and evaluation and provide that the circumstances justifying an extension do not include an investigator's vacation or furlough and that problems with investigator vacations or workload should result in the matter being reassigned; and

i.   any recommended non-disciplinary corrective action or disciplinary action be documented in writing.

33.   The DPD shall revise its policies regarding the review of all investigations to require:

a.   investigations to be reviewed by the chain of command above the investigator;

b.   the reviewing supervisors to identify any deficiencies in those investigations and require the investigator to correct any deficiencies within seven days of the submission of the report and evaluation to the reviewing supervisor;

c.   the reviewing supervisors to recommend and the final reviewing authority to refer any incident with training, policy or procedural implications to the appropriate DPD unit;

d.   appropriate non-disciplinary corrective action and/or disciplinary action when an investigator fails to conduct or reviewing supervisor fails to evaluate an

11

investigation appropriately; and

e.  a written explanation by any supervisor, including the Chief of Police, who disagrees with a finding or departs from a recommended non-disciplinary corrective action or disciplinary action, including the basis for the departure.

B.  Use of Force and Prisoner Injury Investigations

34. The DPD shall revise its reporting policies to require officers to document on a single auditable form any prisoner injury, use of force, allegation of use of force, and instance in which an officer draws a firearm and acquires a target.

35. The DPD shall revise its policies regarding use of force and prisoner injury notifications to require:

a.  officers to notify their supervisors following any use of force or prisoner injury;

b.  that upon such notice, a supervisor shall respond to the scene of all uses of force that involve a firearm discharge, a visible injury or a complaint of injury. A supervisor shall respond to all other uses of force on a priority basis. Upon arrival at the scene, the supervisor shall interview the subject(s), examine the subject(s) for injury, and ensure that the subject(s) receive needed medical attention;

c.  the supervisor responding to the scene to notify IAD of all serious uses of force, uses of force that result in visible injury, uses of force that a reasonable officer should have known were likely to result in injury, uses of force where there is evidence of possible criminal misconduct by an officer or prisoner injury; and

d.  IAD to respond to the scene of, and investigate, all incidents where there is evidence of possible criminal misconduct by an officer, a prisoner dies, suffers serious bodily injury or requires hospital admission, or involves a serious use of force, and to permit IAD to delegate all other use of force or prisoner injury investigations to the supervisor for a command investigation.

36. The DPD shall revise its use of force and prisoner injury investigation policies to require:

a.  command use of force preliminary investigations to be completed within 10 days of the incident. These investigations shall include a synopsis of the incident, photographs of any injuries, witness statements, a canvas of the area, a profile of the officer's prior uses of force and allegations of

12

                misconduct, and a first-line supervisory evaluation. The final command use of force investigation shall be completed within 30 days of the incident;

    b.    IAD investigations to be completed within 60 days of the incident; and

    c.    copies of all reports and command investigations to be sent to IAD within 7 days of completion of the investigation.

C.    Review of Critical Firearm Discharges and In-Custody Deaths

37.    The DPD has created a Shooting Team, composed of officers from the Homicide Section and IAD. The Shooting Team shall respond to the scene and investigate all critical firearms discharges and in-custody deaths.

38.    The DPD shall develop a protocol for conducting investigations of critical firearm discharges that, in addition to the requirements of paragraphs 27-36, requires:

    a.    the investigation to account for all shots fired, all shell casings, and the locations of all officers at the time the officer discharged the firearm;

    b.    the investigator to conduct and preserve in the investigative file all appropriate ballistic or crime scene analyses, including gunshot residue or bullet trajectory tests; and

    c.    the investigation to be completed within 30 days of the incident. If a <u>Garrity</u> statement is necessary, then that portion of the investigation may be deferred until 30 days from the declination or conclusion of the criminal prosecution.

39.    The DPD shall require a command level force review team to evaluate all critical firearm discharges and in-custody deaths. The team shall be chaired by the Deputy Chief who directly supervises IAD. The DPD shall establish criteria for selecting the other members of the team.

40.    The DPD policy that defines the command level force review team's role shall require the team to:

    a.    complete its review of critical firearm discharges that result in injury and in-custody deaths within 90 days of the resolution of any criminal review and/or proceedings and all other critical firearm discharges within 60 days and require the Chief of Police to complete his or her review of the team's report within 14 days;

    b.    comply with the revised review of investigations policies and procedures;

    c.    interview the principal investigators; and

    d.    prepare a report to the Chief of Police in compliance

with the revised investigatory report and evaluation protocol.

41. The Chair of the command level force review team shall annually review critical firearm discharges and in-custody deaths in aggregate to detect patterns and/or problems and report his or her findings and recommendations, including additional investigative protocols and standards for all critical firearm discharge and in-custody death investigations, to the Chief of Police.

## V.  ARREST AND DETENTION POLICIES AND PRACTICES

## A.  Arrest Policies

42. The DPD shall revise its arrest policies to define arrest and probable cause as those terms are defined in this Agreement and prohibit the arrest of an individual with less than probable cause.

43. The DPD shall review all arrests for probable cause at the time the arrestee is presented at the precinct or specialized unit. This review shall be memorialized in writing within 12 hours of the arrest. For any arrest unsupported by probable cause or in which an arraignment warrant was not sought, the DPD shall document the circumstances of the arrest and/or the reasons the arraignment warrant was not sought on an auditable form within 12 hours of the event.

## B.  Investigatory Stop Policies

44. The DPD shall revise its investigatory stop and frisk policies to define investigatory stop and reasonable suspicion as those terms are defined in this Agreement. The policy shall specify that a frisk is authorized only when the officer has reasonable suspicion to fear for his or her safety and that the scope of the frisk must be narrowly tailored to those specific reasons.

45. The DPD shall require written documentation of all investigatory stops and frisks by the end of the shift in which the police action occurred. The DPD shall review all investigatory stops and frisks and document on an auditable form those unsupported by reasonable suspicion within 24 hours of receiving the officer's report.

## C.  Witness Identification and Questioning Policies

46. The DPD shall revise its witness identification and questioning policies to comply with the revised arrest and

14

investigatory stop policies.  The DPD shall prohibit the seizure of an individual without reasonable suspicion, probable cause or consent of the individual and require that the scope and duration of any seizure be narrowly tailored to the reasons supporting the police action.  The DPD shall prohibit the conveyance of any individual to another location without reasonable suspicion, probable cause or consent of the individual.

47. The DPD shall develop the revised witness identification and questioning policies within three months of the effective date of this Agreement.  The revised policies shall be submitted for review and approval of the DOJ.  The DPD shall implement the revised witness identification and questioning policies within three months of the review and approval of the DOJ.

48. The DPD shall document the content and circumstances of all interviews, interrogations and conveyances during the shift in which the police action occurred.  The DPD shall review in writing all interviews, interrogations and conveyances and document on an auditable form those in violation of DPD policy within 12 hours of the interview, interrogation or conveyance.

D. Prompt Judicial Review Policies

49. The DPD shall revise its policies to require prompt judicial review, as defined in this Agreement, for every person arrested by the DPD.  The DPD shall develop a timely and systematic process for all arrestees to be presented for prompt judicial review or to be released.

50. The DPD shall require that, for each arrestee, a warrant request for arraignment on the charges underlying the arrest is submitted to the prosecutor's office within 24 hours of the arrest.

51. The DPD shall document on an auditable form all instances in which the request for an arraignment warrant is submitted more than 24 hours after the arrest.  The DPD shall also document on an auditable form all instances in which it is not in compliance with the prompt judicial review policy and in which extraordinary circumstances delayed the arraignment.  The documentation shall occur by the end of the shift in which there was 1) a failure to request an arraignment warrant within 24 hours, 2) a failure to comply with the prompt judicial review policy, or 3) an arraignment delayed because of extraordinary circumstances.

E.   Hold Policies

52.  The DPD shall revise its hold policies to define a hold as
     that term is defined in this Agreement and require that all
     holds be documented.  The policy shall establish a timely
     and systematic process for persons in DPD custody who have
     holds issued by a City of Detroit court to have those holds
     cleared by presenting the arrestee to the court from which
     the warrant was issued or the setting and posting of bond
     where applicable.  The fact that an arrestee has not been
     arraigned or charged on the current arrest shall not delay
     this process.

53.  The DPD shall document all holds, including the time each
     hold was identified and the time each hold was cleared.  The
     DPD shall document on an auditable form each instance in
     which a hold is not processed within twenty-four hours on a
     daily basis.

F.   Restriction Policies

54.  The DPD shall develop a policy regarding restricting
     detainee's access to telephone calls and visitors that
     permits individuals in DPD custody access to attorneys and
     reasonable access to telephone calls and visitors.

55.  The DPD shall require that such restrictions be documented
     and reviewed at the time the restriction is issued and
     reevaluated each day in which the restriction remains in
     effect.  The DPD shall document on an auditable form any
     violation of the restriction policy by the end of the shift
     in which the violation occurred.

G.   Material Witness Policies

56.  The DPD shall revise its material witness policies to define
     material witness as that term is defined in this Agreement
     and remove the term "police witness" from DPD policies and
     procedures.

57.  The DPD shall obtain a court order prior to taking a
     material witness into DPD custody.  The DPD shall document
     on an auditable form the detention of each material witness
     and attach a copy of the court order authorizing the
     detention.

H.    Documentation of Custodial Detention

58.   The DPD shall revise its arrest and detention documentation
      to require, for all arrests, a record or file to contain
      accurate and auditable documentation of:

      a.   the individual's personal information;
      b.   the crime(s) charged;
      c.   the time and date of arrest and release;
      d.   the time and date the arraignment warrant was
           submitted;
      e.   the name and badge number of the officer who submitted
           the arraignment warrant;
      f.   the time and date of arraignment;
      g.   the time and date each warrant was lodged and cleared,
           if applicable; and
      h.   the individual's custodial status, e.g., new arrest,
           material witness or extradition.

I.    Command Notification

59.   The DPD shall require the commander of the precinct and, if
      applicable, of the specialized unit to review in writing all
      reported violations of DPD arrest, investigatory stop and
      frisk, witness identification and questioning policies and
      all reports of arrests in which an arraignment warrant was
      not sought.  The commander's review shall be completed
      within 7 days of receiving the document reporting the event.
      The commander's review shall include an evaluation of the
      actions taken to correct the violation and whether any
      corrective or non-disciplinary action was taken.

60.   The DPD shall require the commander of the precinct and, if
      applicable, of the specialized unit to review in writing all
      violations of DPD prompt judicial review, holds,
      restrictions and material witness policies on a daily basis.
      The commander's review shall include an evaluation of the
      actions taken to correct the violation and whether any
      corrective or non-disciplinary action was taken.

VI.   EXTERNAL COMPLAINTS

61.   The DPD and City shall revise their external complaint
      policy to clearly delineate the roles and responsibilities
      of OCI and the DPD regarding the receipt, investigation and
      review of external complaints.  At a minimum, the plan shall
      specify each agency's responsibility for receiving,
      recording, investigating and tracking complaints; each

17

agency's responsibility for conducting community outreach
and education regarding complaints; how, when and in what
fashion the agencies shall exchange information, including
complaint referrals and information about sustained
complaints.

62. The DPD and the City shall develop and implement an
informational campaign regarding external complaints,
including:

    a.   informing persons that they may file complaints
regarding the performance of any DPD employee;

    b.   distributing complaint forms, fact sheets and
informational posters at City Hall, OCI, all DPD
precincts, libraries, on the internet and, upon
request, to community groups and community centers;

    c.   broadcasting public service announcements that describe
the complaint process; and

    d.   posting permanently a placard describing the complaint
process, with relevant phone numbers, in the lobby of
each DPD precinct.

63. The DPD shall require all officers to carry informational
brochures and contact forms in their vehicles at all times
while on-duty.  The DPD shall develop a contact form within
60 days of the effective date of this Agreement.  The
contact form shall be submitted for review and approval of
the DOJ.  The DPD shall implement the contact form within 60
days of the review and approval of the DOJ.  The DPD shall
require all officers to inform an individual of his or her
right to make a complaint, if an individual objects to an
officer's conduct.  The DPD shall prohibit officers from
discouraging any person from making a complaint or refusing
to take a complaint.

A. Intake and Tracking

64. The DPD and the City shall revise their policies regarding
the intake and tracking of external complaints to define
complaint and misconduct as those terms are defined in this
Agreement and require all officers and OCI employees to
accept and document all complaints filed in writing or
verbally, in person or by mail, telephone (or TDD),
facsimile or electronic mail.

65. The DPD and the City shall permit the intake officer or
employee to include a factual account and/or description of
a complainant's demeanor and physical condition but not an

18

opinion regarding the complainant's mental competency or veracity.

66. The DPD and the City shall assign all complaints a unique identifier, which shall be provided to the complainant, and a description of the basis for the complaint (e.g., excessive force, discourtesy or improper search).

B.  External Complaint Investigation

67. The DPD and the City shall revise its policies regarding external complaint investigations to:

   a.  provide that all complaints shall be referred for investigation and resolution by OCI or, if the complaint alleges potentially criminal conduct by an officer, by IAD;
   b.  permit the informal resolution of complaints alleging only inadequate service or the complainant's innocence of a charge and require the investigation and formal resolution of all other complaints;
   c.  refer all complaints to the appropriate agency within five business days of their receipt;
   d.  require that the complainant shall be periodically kept informed regarding the status of the investigation;
   e.  develop written criteria for IAD and OCI investigator applicants, including the applicant's complaint and disciplinary history and investigative experience;
   f.  implement mandatory pre-service and in-service training for all IAD and OCI investigators, including intake, investigations, interviews and resolutions of external complaints;
   g.  require IAD and OCI to complete all investigations within 60 days of receiving the complaint; and
   h.  require that, upon completion of the investigation, the complainant shall be notified of its outcome, including an appropriate statement regarding whether any non-disciplinary corrective action or disciplinary action was taken.

68. The DPD and the City shall review and evaluate the external complaint review process to require:

   a.  the Chief Investigator or his of her designee to complete review of OCI investigations within 7 days of completion of the supervisor's review;
   b.  the BPC to complete review of OCI investigations within 45 days of completion of the Chief Investigator's review; and

     c.    the Chief of Police or his or her designee to complete his or her review of external complaints within 7 days of completion of the BPC's review.

69.    In addition to the investigatory report and evaluation requirements, each allegation in an administrative external complaint investigation shall be resolved by making one of the following dispositions:

     a.    "Unfounded," where the investigation revealed no facts to support that the incident complained of actually occurred;
     b.    "Sustained," where a preponderance of the evidence shows that the alleged conduct did occur and the actions of the officer violated DPD policies, procedures or training;
     c.    "Not Sustained," where there are insufficient facts to decide whether the alleged misconduct occurred; and
     d.    "Exonerated," where a preponderance of the evidence shows that the alleged conduct did occur but did not violate DPD policies, procedures or training.

## VII. GENERAL POLICIES

70.    In developing and revising the policies discussed in this Agreement, the DPD shall ensure that all terms are clearly defined.

71.    The DPD shall continue to make available proposed policy revisions to the community, for their review, comment and education.  Such policy revisions shall also be published on the DPD's website to allow comments to be provided directly to the DPD.

72.    The DPD shall advise all officers, including supervisors, that taking police action in violation of DPD policy shall subject officers to discipline, possible criminal prosecution, and/or civil liability.

73.    The DPD and the City shall develop a plan for ensuring regular field deployment of an adequate number of supervisors of patrol units and specialized units that deploy in the field to implement the provisions of this agreement.

74.    The DPD shall enforce its policies requiring all DPD officers to report any misconduct committed by another DPD officer, whether committed on-duty or off-duty.

75. The DPD shall revise its policies regarding off-duty officers taking police action to:

   a.  provide that off-duty officers shall notify on-duty DPD or local law enforcement officers before taking police action, absent exigent circumstances, so that they may respond with appropriate personnel and resources to handle the problem;

   b.  prohibit off-duty officers from carrying or using firearms or taking police action in situations where an officer's performance may be impaired or the officer's ability to take objective action may be compromised; and

   c.  provide that, if it appears the officer has consumed alcohol or is otherwise impaired, the officer shall submit to field sobriety, breathalyser, and/or blood tests.

76. The DPD shall revise its policies regarding prisoners to:

   a.  require officers to summon emergency medical services to transport prisoners when the restraints employed indicate the need for medical monitoring;

   b.  require officers to utilize appropriate precautions when interacting with a prisoner who demonstrates he or she is recalcitrant or resistant, including summoning additional officers, summoning a supervisor and using appropriate restraints; and

   c.  prohibit arresting and transporting officers from accompanying prisoners into the holding cell area.

77. The DPD shall develop a foot pursuit policy to:

   a.  require officers to consider particular factors in determining whether a foot pursuit is appropriate, including the offense committed by the subject, whether the subject is armed, the location (e.g., lighting and officer familiarity), whether more than one officer is available to engage in the pursuit, the proximity of reinforcements, and the ability to apprehend the subject at a later date;

   b.  emphasize alternatives to foot pursuits, including area containment, surveillance, and obtaining reinforcements;

   c.  emphasize the danger of pursuing and engaging a subject with a firearm in hand; and

   d.  require officers to document all foot pursuits that involve a use of force on a separate, auditable form,

such as the use of force report.

## VIII. MANAGEMENT AND SUPERVISION

78. The DPD shall devise a comprehensive risk management plan, including:

   a. a risk management database (discussed in paragraphs 79-90;
   b. a performance evaluation system (discussed in paragraph 91;
   c. an auditing protocol (discussed in paragraphs 92-99;
   d. regular and periodic review of all DPD policies; and
   e. regular meetings of DPD management to share information and evaluate patterns of conduct by DPD that potentially increase the DPD's liability.

## A. Risk Management Database

79. The DPD shall enhance and expand its risk management system to include a new computerized relational database for maintaining, integrating and retrieving data necessary for supervision and management of the DPD. Priority shall be given to the DPD obtaining an established program and database. The DPD shall ensure that the risk management database it designs or acquires is adequate to evaluate the performance of DPD officers across all ranks, units and shifts; to manage risk and liability; and to promote civil rights and best police practices. The DPD shall regularly use this data for such review and monitoring.

80. The new risk management database shall collect and record the following information:

   a. all use of force reports and use of force investigations;
   b. all canine deployments;
   c. all canine apprehensions;
   d. all canine bites;
   e. all canisters of chemical spray issued to officers;
   f. all injured prisoner reports and injured prisoner investigations;
   g. all instances in which force is used and a subject is charged with "resisting arrest," "assault on a police officer," "disorderly conduct" or "interfering with a city employee;"
   h. all firearm discharge reports and firearm discharge investigations;

22

i. all incidents in which an officer draws a firearm and acquires a target;

j. all complaints and complaint investigations, entered at the time the complaint is filed and updated to record the finding;

k. all preliminary investigations and investigations of alleged criminal conduct;

l. all criminal proceedings initiated, as well as all civil or administrative claims filed with, and all civil lawsuits served upon, the City, or its officers, or agents, resulting from DPD operations or the actions of DPD personnel, entered at the time proceedings are initiated and updated to record disposition;

m. all vehicle and foot pursuits and traffic collisions;

n. all reports regarding arrests without probable cause or where the individual was discharged from custody without formal charges being sought;

o. all reports regarding investigatory stops and/or frisks unsupported by reasonable suspicion;

p. all reports regarding interviews, interrogations or conveyances in violation of DPD policy;

q. the time between arrest and arraignment for all arrests;

r. all reports regarding a violation of DPD prompt judicial review policy;

s. all reports regarding a violation of DPD hold policy;

t. all restrictions on phone calls or visitors imposed by officers;

u. all instances in which the DPD is informed by a prosecuting authority that a declination to prosecute any crime was based, in whole or in part, upon concerns about the credibility of a DPD officer or that a motion to suppress evidence was granted on the grounds of a constitutional violation by a DPD officer;

v. all disciplinary action taken against officers;

w. all non-disciplinary corrective action required of officers, excluding administrative counseling records;

x. all awards and commendations received by officers;

y. the assignment, rank, and training history of officers; and

z. firearms qualification information of officers.

81. The new risk management database shall include, for each incident, appropriate identifying information for each involved officer (including name, pension number, badge number, shift and supervisor) and civilian (including race, ethnicity or national origin, sex, and age).

23

82. The DPD shall prepare, for the review and approval of the DOJ, a Data Input Plan for including appropriate fields and values of new and historical data into the risk management database and addressing data storage. The Data Input Plan shall:

    a. detail the specific fields of information to be included and the means for inputting such data (direct entry or otherwise);

    b. specify the unit responsible for inputting data, the deadlines for inputting the data in a timely, accurate, and complete manner;

    c. specify the historical time periods for which information is to be input and the deadlines for inputting the data in an accurate and timely fashion; and

    d. require that the data be maintained in a secure and confidential manner.

83. The DPD shall prepare, for the review and approval of the DOJ, a Report Protocol for the risk management database that details the types of routine reports the DPD shall generate and pattern identifications the DPD shall conduct. The Report Protocol shall:

    a. require the automated system to analyze the data according to the following criteria:

        i) number of incidents for each data category by individual officer and by all officers in a unit;

        ii) average level of activity for each data category by individual officer and by all officers in a unit; and

        iii) identification of patterns of activity for each data category by individual officer and by all officers in a unit;

    b. establish thresholds for the numbers and types of incidents requiring a review by an officer's supervisor of whether the officer or group of officers is engaging in at-risk behavior (in addition to the regular reviews required by paragraph 84); and

    c. require the database to generate reports on a monthly basis describing the data and data analysis and identifying individual and unit patterns.

84. The DPD shall prepare, for the review and approval of the DOJ, a Review Protocol for using the risk management database that addresses data analysis, supervisory

24

assessment, supervisory intervention, documentation and
auditing. The Review Protocol shall require:

a.  that when an officer or group of officers pass a
    threshold established in the Report Protocol the
    officer's(s') supervisor shall review all information
    in the risk management database regarding the
    officer(s), together with other relevant information;

b.  the reviewing supervisor to document whether he or she
    took non-disciplinary corrective action or recommended
    disciplinary action, the basis for this decision, and
    what corrective action was taken, if any;

c.  supervisors to review, on a regular basis but not less
    than quarterly, database reports, together with other
    relevant information, to evaluate individual officer
    and unit activity for at-risk behavior;

d.  precinct and unit commanders to review, on a regular
    basis but not less than quarterly, database reports,
    together with other relevant information, to evaluate
    individual supervisor's assessment and analysis of
    information in the risk management database and the
    corrective action taken by supervisors;

e.  appropriate DPD supervisors to review and evaluate, on
    a regular basis but not less than quarterly, police
    performance citywide, using all relevant information
    from the risk management database and other relevant
    information and to evaluate and make appropriate
    comparisons regarding the performance of all DPD units
    in order to identify any significant patterns or series
    of incidents;

f.  commanders and supervisors conducting such periodic
    reviews to take non-disciplinary corrective action when
    appropriate for individual officers, supervisors or
    units and document any such action in writing;

g.  that the information in the database be accessible to
    commanders, supervisors and the BPC;

h.  that the information in the database is considered when
    evaluating a DPD employee for transfer or promotion;

i.  commanders and supervisors to promptly review records
    of all officers recently transferred to their sections
    and units;

j.  commanders and supervisors to be evaluated on their
    ability to use the risk management database to enhance
    effectiveness and reduce risk;

k.  that a designated DPD unit be responsible for managing
    and administering the database, including conducting
    quarterly audits of the system to ensure action is
    taken according to the process described above; and

l.  that aggregated information from the risk management

25

database be shared on a regular and periodic basis with training and policy planning staff.

85.  The DPD shall seek to ensure that the risk management database is created as expeditiously as possible.  As part of this effort, the DPD, in consultation with the DOJ, shall organize the risk management database into modules in developing the Data Input Plan, the Report Protocol, the Review Protocol and the Request for Proposals and in negotiating with contractors, such that difficulties with one aspect of the risk management database do not delay implementation of other modules.

86.  Where information about a single incident is entered into the risk management database from more than one document (e.g., from a complaint form and a use of force report), the risk management database shall use a common control number or other equally effective means to link the information from different sources so that the user can cross-reference the information and perform analyses.

87.  The City shall maintain all personally identifiable information about an officer included in the risk management database during the officer's employment with the DPD and for at least five years after separation.  Information necessary for aggregate statistical analysis shall be maintained indefinitely in the risk management database.

88.  The new risk management database shall be developed and implemented according to the following schedule:

a.  Within 90 days of the effective date of this Agreement, the DPD shall submit the Data Input Plan to the DOJ for review and approval.  The DPD shall share drafts of this document with the DOJ to allow the DOJ to become familiar with the document as it is developed and to provide informal comments.  The DPD and the DOJ shall together seek to ensure that the Data Input Plan receives final approval within 30 days after it is presented for review and approval.

b.  By September 30, 2003, the DPD shall submit the Report Protocol and a Request for Proposals to the DOJ for review and approval.  The DPD shall share drafts of these documents with the DOJ to allow the DOJ to become familiar with the documents as developed and to provide informal comments.  The DPD and the DOJ shall together seek to ensure that the Report Protocol and the Request for Proposals receive final approval within 30 days after they are presented for review and approval.

    c.    By October 31, 2003, the DPD shall issue the Request for Proposals.

    d.    By March 30, 2004, the DPD shall submit the Review Protocol to the DOJ for review and approval. The DPD shall share drafts of this document with the DOJ and the Monitor (a position described in Section X) to allow the DOJ and the Monitor to become familiar with the document as it develops and to provide informal comments on it. The DPD and the DOJ shall together seek to ensure that the protocol receives final approval within 30 days after it is presented for review and approval.

    e.    By May 31, 2004, the DPD shall select the contractor to create the risk management database.

    f.    By June 30, 2005, the City shall have ready for testing a beta version of the risk management database consisting of: i) server hardware and operating systems installed, configured and integrated with the City and DPD's existing automated systems; ii) necessary data base software installed and configured; iii) data structures created, including interfaces to source data; and iv) the information system completed, including historic data. The DOJ and the Monitor shall have the opportunity to participate in testing the beta version using new and historical data and test data created specifically for purposes of checking the risk management database.

    g.    The risk management database shall be operational and fully implemented by December 31, 2005.

89.    Prior to implementation of the new risk management database, the DPD shall develop an interim system to identify patterns of conduct by DPD officers or groups of officers. The interim system shall require periodic reviews of relevant information, but no less than monthly, and evaluations of whether an officer or group of officers is engaging in at-risk behavior. This interim system shall collect and analyze the following information: citizen complaint reports and investigations; use of force investigations; shootings; vehicle chases; injured prisoner investigations; traffic collisions; canisters of chemical spray issued to officers; firearms qualifications; training; prompt judicial review; disciplinary action; arrest without probable cause; all reports regarding investigatory stops and/or frisks unsupported by reasonable suspicion; and all reports regarding interviews, interrogations or conveyances in violation of DPD policy in a format that facilitates entry into the final risk management database, to the fullest extent possible.

27

90.    Following the initial implementation of the risk management
       database, and as experience and the availability of new
       technology may warrant, the DPD may propose to subtract or
       modify data tables and fields, modify the list of documents
       scanned or electronically attached, and subtract or modify
       standardized reports and queries.  The DPD shall submit all
       such proposals for review and approval by the DOJ before
       implementation.

B.     Performance Evaluation System

91.    DPD shall ensure that performance evaluations for all DPD
       employees occur at least annually and include, but are not
       limited to, consideration of the following:

       a.    civil rights integrity;
       b.    adherence to law, including performing duties in a
             manner consistent with the requirements of the Fourth
             and Fifth Amendments to the Constitution and the Civil
             Rights laws of the United States; and
       c.    supervisor's performance in identifying and addressing
             at-risk behavior in subordinates, including their
             supervision and review of use of force, arrests, care
             of prisoners, prisoner processing, and performance
             bearing upon honesty and integrity.

C.     Oversight

92.    The DPD shall develop a protocol for conducting audits to be
       used by each officer or supervisor charged with conducting
       audits.  The protocol shall establish a regular and fixed
       schedule to ensure that such audits occur with sufficient
       frequency and cover all DPD units and commands.

93.    The DPD shall issue a report to the Chief of Police on the
       result of each audit and examine whether there is
       consistency throughout the DPD.  The DPD shall also provide
       the reports to each precinct or specialized unit commander.
       The commander of each precinct and specialized unit shall
       review all audit reports regarding employees under their
       command and, if appropriate, shall take non-disciplinary
       corrective action or disciplinary action.

94.    The DPD shall conduct regularly scheduled quarterly audits,
       covering all DPD units and commands that investigate uses of
       force, prisoner injuries, and allegations of misconduct.
       The audits shall include reviewing a sample of command, IAD,
       and Homicide Section investigations; evaluating whether the
       actions of the officer and the subject were captured

correctly in the investigative report; and evaluating the preservation and analysis of the evidence and the appropriateness of the investigator's conclusions.

95. The DPD shall conduct regularly scheduled quarterly audits covering all precincts and specialized units that review a sample of findings of probable cause, stop and frisk reports and witness identification and questioning documentation. The audits shall include evaluating the scope, duration, content, and voluntariness, if appropriate, of the police interaction. The audits shall include a comparison of the number of arrests to requests for warrants and a comparison of the number of arrests for which warrants were sought to judicial findings of probable cause.

96. The DPD shall conduct regularly scheduled quarterly audits covering all precincts and specialized units that examine custodial detention practices. The audits shall include reviewing the length of detention between arrest and arraignment and the time to adjudicate holds.

97. The Chief Investigator of OCI shall designate an individual or entity to conduct regularly scheduled quarterly audits that examine external complaints and complaint investigations. The audit shall include reviewing a sample of complaints that were resolved informally, reviewing a sample of OCI investigations of complaints, and contacting the complainants to evaluate whether the actions and views of the complainant were captured correctly in the complaint report and/or investigation. The Chief Investigator shall review all audit reports regarding officers under OCI command and, if appropriate, shall take non-disciplinary corrective action or disciplinary action.

98. The DPD shall conduct and document periodic random reviews of scout car camera videotapes for training and integrity purposes. In addition, the DPD shall require periodic random surveys of scout car video recording equipment to confirm that it is in proper working order.

99. The DPD shall ensure regular meetings with local prosecutors to identify issues in officer, shift or unit performance.

D. Use of Video Cameras

100. The DPD shall repair or replace all non-functioning video cameras.

101. The DPD policy on video cameras shall be revised and augmented to require:

a.    activation of scout car video cameras at all times the
      officer is on patrol;
b.    supervisors to review videotapes of all incidents
      involving injuries to a prisoner or an officer, uses of
      force, vehicle pursuits and external complaints; and
c.    that the DPD retain and preserve videotapes for at
      least 90 days, or as long as necessary for incidents to
      be fully investigated.

102. The DPD policy on video cameras shall require officers to
     record all motor vehicle stops, consents to search a
     vehicle, deployments of a drug-detection canine, or vehicle
     searches.

E.    Discipline

103. The City shall ensure that adequate resources are provided
     to eliminate the backlog of disciplinary cases and that all
     disciplinary matters are resolved as soon as reasonably
     possible.

104. The DPD shall schedule disciplinary hearings, trials, and
     appeals at appropriately frequent intervals, to prevent a
     disciplinary backlog from developing.  As part of
     determining how often to schedule such hearings, the DPD
     shall establish guidelines dictating the maximum period of
     time that should elapse between each stage of the
     disciplinary process.

105. The DPD shall create a disciplinary matrix that:

a.    establishes a presumptive range of discipline for each
      type of rule violation;
b.    increases the presumptive discipline based on both an
      officer's prior violations of the same rule as well as
      violations of other rules;
c.    requires that any departure from the presumptive range
      of discipline must be justified in writing;
d.    provides that the DPD shall not take only
      non-disciplinary corrective action in cases in which
      the disciplinary matrix calls for the imposition of
      discipline; and
e.    provides that the DPD shall consider whether
      non-disciplinary corrective action also is appropriate
      in a case where discipline has been imposed.

30

## IX.  TRAINING

A.  Oversight and Development

106. The DPD shall coordinate and review all use of force and arrest and detention training to ensure quality, consistency and compliance with applicable law and DPD policy.  The DPD shall conduct regular subsequent reviews, at least semi-annually, and produce a report of such reviews to the Monitor and the DOJ.

107. The DPD, consistent with Michigan law and the Michigan Law Enforcement Officers Training Council standards, shall:

    a.  ensure the quality of all use of force and arrest and detention training;
    b.  develop use of force and arrest and detention training curricula;
    c.  select and train DPD officer trainers;
    d.  develop, implement, approve and oversee all training and curricula;
    e.  establish procedures for evaluating all training curricula and procedures; and
    f.  conduct regular needs assessments to ensure that training governing use of force and arrest and detention are responsive to the knowledge, skills and abilities of the officers being trained.

108. The DPD shall create and maintain individual training records for all officers, documenting the date and topic of all pre-service and in-service training completed for all training conducted on or after the effective date of this Agreement.

109. The DPD shall ensure that only mandated objectives and approved lesson plans are taught by instructors and that instructors engage students in meaningful dialogue regarding particular scenarios, preferably taken from actual incidents involving DPD officers, with the goal of educating students regarding the legal and tactical issues raised by the scenarios.

110. The DPD shall meet with the City Law Department on a quarterly basis concerning the conclusion of civil lawsuits alleging officer misconduct.  Information gleaned from this process shall be distributed to DPD risk management and training staff.

111. The City and the DPD shall distribute and explain this Agreement to all DPD and all relevant City employees.  The

31

City and the DPD shall provide initial training on this Agreement to all City and DPD employees whose job responsibilities are effected by this Agreement within 120 days of each provision's implementation.  Thereafter, the DPD shall provide training on the policies contained in this Agreement during in-service training.

B.    Use of Force Training

112.  The DPD shall provide all DPD recruits, officers, and supervisors with annual training on use of force.  Such training shall include and address the following topics:

a.    the DPD's use of force continuum; proper use of force; decision making; and the DPD's use of force reporting requirements;

b.    the Fourth Amendment and other constitutional requirements, including recent legal developments;

c.    examples of scenarios faced by DPD officers and interactive exercises that illustrate proper use of force decision making, including the use of deadly force;

d.    the circumstances in which officers may draw, display, or point a firearm, emphasizing:

i)    officers should not draw their firearm unless they reasonably believe there is a threat of serious bodily harm to the officer or another person;

ii)   the danger of engaging or pursuing a subject with a firearm drawn; and

iii)  that officers are generally not justified in drawing their firearm when pursuing a subject suspected of committing only a misdemeanor;

e.    the proper use of all intermediate force weapons;

f.    threat assessment, alternative and de-escalation techniques that allow officers to effect arrests without using force and instruction that disengagement, area containment, surveillance, waiting out a subject, summoning reinforcements, calling in specialized units or even letting a subject temporarily evade arrest may be the appropriate response to a situation, even when the use of force would be legally justified;

g.    interacting with people with mental illnesses, including instruction by mental health practitioners and an emphasis on de-escalation strategies;

h.    factors to consider in initiating or continuing a pursuit;

i.    the proper duration of a burst of chemical spray, the

32

distance from which it should be applied, and emphasize that officers shall aim chemical spray only at the target's face and upper torso; and

j.   consideration of the safety of civilians in the vicinity before engaging in police action.

C.   Firearms Training

113.  The DPD shall develop a protocol regarding firearms training that:

a.   ensures that all officers and supervisors complete the bi-annual firearms training and qualification;

b.   incorporates professional night training, stress training (i.e., training in using a firearm after undergoing physical exertion) and proper use of force decision making training in the bi-annual in-service training program, with the goal of adequately preparing officers for real life situations;

c.   ensures that firearm instructors critically observe students and provide corrective instruction regarding deficient firearm techniques and failure to utilize safe gun handling procedures at all times; and

d.   incorporates evaluation criteria to determine satisfactory completion of recruit and in-service firearms training, including:

i)   maintains finger off trigger unless justified and ready to fire;

ii)  maintains proper hold of firearm and proper stance; and

iii) uses proper use of force decision making.

D.   Arrest and Police-Citizen Interaction Training

114.  The DPD shall provide all DPD recruits, officers and supervisors with annual training on arrests and other police-citizen interactions.  Such training shall include and address the following topics:

a.   the DPD arrest, investigatory stop and frisk and witness identification and questioning policies;

b.   the Fourth Amendment and other constitutional requirements, including:

i)   advising officers that the "possibility" that an individual committed a crime does not rise to the level of probable cause;

33

      ii)  advising officers that the duration and scope of
             the police-citizen interaction determines whether
             an arrest occurred, not the officer's subjective,
             intent or belief that he or she affected an
             arrest; and

      iii) advising officers that every detention is a
             seizure, every seizure requires reasonable
             suspicion or probable cause and there is no
             legally authorized seizure apart from a "<u>Terry</u>
             stop" and an arrest; and

    c.    examples of scenarios faced by DPD officers and
         interactive exercises that illustrate proper
         police-community interactions, including scenarios
         which distinguish an investigatory stop from an arrest
         by the scope and duration of the police interaction;
         between probable cause, reasonable suspicion and mere
         speculation; and voluntary consent from mere
         acquiescence to police authority.

E.   Custodial Detention Training

115. The DPD shall provide all DPD recruits, officers and
     supervisors with annual training on custodial detention.
     Such training shall include DPD policies regarding arrest,
     arraignment, holds, restrictions, material witness and
     detention records.

116. The DPD shall advise officers that the DPD arraignment
     policy shall not be delayed because of the assignment of the
     investigation to a specialized unit, the arrest charge(s),
     the availability of an investigator, the gathering of
     additional evidence or obtaining a confession.

117. The DPD shall advise officers that whether an individual is
     a material witness and whether that material witness should
     be committed to custody is a judicial determination.

F.   Supervisory Training

118. The DPD shall provide supervisors with training in the
     appropriate evaluation of written reports, including what
     constitutes a fact based description, the identification of
     conclusory language not supported by specific facts and
     catch phrases, or language that so regularly appears in
     reports that its inclusion requires further explanation by
     the reporting officer.

119. DPD supervisors shall receive leadership and command accountability training and learn techniques designed to promote proper police practices. This training shall be provided to all DPD supervisors within 30 days of assuming supervisory responsibilities and shall be made part of annual in-service training.

120. The DPD shall provide training on risk assessment and risk management to all DPD supervisors, including the operation of the risk management database.

G.   Investigator Training

121. The DPD shall provide training on appropriate burdens of proof, interview techniques and the factors to consider when evaluating officer, complainant or witness credibility to all officers who conduct investigations to ensure that their recommendations regarding dispositions are unbiased, uniform and legally appropriate.

122. The DPD shall provide all supervisors charged with accepting external complaints with appropriate training on handling external complaints that emphasizes interpersonal skills. The DPD shall provide training on the DPD external complaint process, including the role of OCI and IAD in the process, to all new recruits and as part of annual in-service training.

H.   Field Training

123. The DPD shall develop, subject to DOJ approval, a protocol to enhance the FTO program within 120 days of the effective date of this Agreement. The protocol shall address the criteria and method for selecting and removing the FTOs and for training and evaluating FTOs and trainees.

X.   MONITORING, REPORTING, AND IMPLEMENTATION

A.   Selection of the Monitor

124. The DOJ and the City shall select a Monitor with law enforcement experience, a reputation for integrity and an absence of bias, including any appearance of bias, for or against the DOJ, the City or the DPD, who shall review and report on the City and the DPD's implementation of this Agreement:

35

    a.   If the DOJ and the City have not agreed upon a Monitor
          prior to the effective date of this Agreement, then
          within 60 days of the effective date of this Agreement,
          the DOJ, together with the City, jointly shall issue a
          solicitation for bid proposals for appointment as the
          Monitor.  In addition to a targeted national mailing,
          the solicitation shall be published in several national
          newspapers, and the web sites of the City and the DOJ.
          The City shall bear the cost of publicizing the
          solicitation.

    b.   The deadline for the submission of such proposals shall
          be 30 days after publication of the solicitation on the
          City's website.

    c.   All proposals for appointment as the Monitor under this
          provision shall include plans for experts to be
          utilized, resumes and curriculum vitae of proposed
          experts, cost proposals and any other information that
          the City and the DOJ deem necessary.

125. The DOJ, the City and the DPD have resolved the DOJ's claims
     regarding the conditions of confinement in DPD holding cells
     in a separately filed Agreement.  The holding cell Agreement
     also requires the selection of a Monitor to review and
     report on the City and the DPD's implementation of that
     Agreement.  The parties recognize that one person, or team
     of people, may be selected to fulfill both monitoring roles
     or that separate Monitors may be selected.  If separate
     Monitors are selected, the Monitors shall confer and
     coordinate their efforts on issues that overlap both
     Agreements.

126. If the City and the DOJ are unable to agree on a Monitor,
     prior to or within 180 days of the effective date of this
     Agreement, the City and the DOJ shall submit two names of
     persons or teams of people with law enforcement experience,
     a reputation for integrity and an absence of bias, including
     any appearance of bias, for or against the DOJ, the City or
     the DPD, along with resumes or curriculum vitae and cost
     proposals, to the Court, and the Court shall appoint the
     Monitor from among the names of qualified persons submitted.

127. In the interest of expediting the selection and contracting
     processes for the Monitor, the City and the DOJ shall be
     exempt from local contracting procurement regulations and
     all such regulations shall be considered waived for this
     purpose.

128. The Monitor, at any time after the initial selection of the
     person or team of persons as the Monitor, may request to be

allowed to hire or employ such additional persons or
entities as are reasonably necessary to perform the tasks
assigned to him or her by this Agreement.  Any person or
entity hired or otherwise retained by the Monitor to assist
in furthering any provisions of this Agreement shall be
subject to the provisions of paragraphs 135, 136, and 144,
governing testifying, conflicting employment and
confidentiality.  The Monitor shall notify the City and the
DOJ in writing if the Monitor wishes to select such
additional persons or entities.  The notice shall identify
and describe the qualifications of the person or entity to
be hired or employed and the monitoring task to be
performed.  If the City and the DOJ agree to the Monitor's
proposal, the Monitor shall be authorized to hire or employ
such additional persons or entities.  The City or the DOJ
have ten days to disagree with the proposal.  If the City
and the DOJ are unable to reach agreement within ten days of
receiving notice of the disagreement, the Court shall
resolve the dispute.

129. The City shall bear all reasonable fees and costs of the
Monitor and any persons hired or employed pursuant to
paragraph 128.  The Court retains the authority to resolve
any dispute that may arise regarding the reasonableness of
fees and costs charged by the Monitor.  In selecting the
Monitor, the City and the DOJ recognize the importance of
ensuring that the fees and costs borne by the City are
reasonable, and accordingly, fees and costs shall be one
factor considered in selecting the Monitor.  In the event
that any dispute arises regarding the payment of the
Monitor's fees and costs, the City, the DOJ, and the Monitor
shall attempt to resolve such disputes cooperatively.  If
the City, the DOJ and the Monitor are unable to reach
agreement, the Court shall resolve the dispute.

130. The Monitor shall not be subject to dismissal except by the
Court upon motion of the City or the DOJ and a showing of
good cause.

B.   Duties of the Monitor

131. The Monitor shall be an agent of the Court and shall be
subject to the supervision and orders of this Court,
consistent with this Agreement.  The Monitor shall only have
the duties, responsibilities and authority conferred by this
Agreement.  The Monitor shall not, and is not intended to,
replace or take over the role and duties of any City or DPD
employee.  The Monitor may not modify, amend, diminish or
expand this Agreement.

37

132. The Monitor shall offer the parties technical assistance regarding compliance with this Agreement. Technical assistance shall be provided to a party upon request and it shall be offered consistent with the provisions of this Agreement. In monitoring the implementation of this Agreement, the Monitor shall maintain regular contact with the parties.

133. In order to monitor and report on the City and the DPD's implementation of each substantive provision of this Agreement, the Monitor shall conduct the compliance reviews specified in paragraph 138 of this Agreement and such additional reviews as the Monitor deems appropriate. The Monitor may make recommendations to the parties regarding measures necessary to ensure full and timely implementation of this Agreement.

134. To assist the parties and the Court in assessing the City and the DPD's implementation of each substantive provision of this Agreement, the Monitor shall prepare the reports specified in paragraph 142 of this Agreement and such additional reports as the Monitor deems appropriate.

135. The Monitor may testify in this case regarding any matter relating to the implementation, enforcement, or dissolution of this Agreement. The Monitor shall not testify in any other litigation or proceeding with regard to any act or omission of the City, the DPD, or any of their agents, representatives, or employees related to this Agreement or regarding any matter or subject that the Monitor may have received knowledge of as a result of his or her performance under this Agreement. The Monitor shall not issue statements or make findings with regard to any act or omission of the City, the DPD, or their agents or representatives, except as required by the provisions of this Agreement.

136. Unless such conflict is waived by the parties, the Monitor shall not accept employment or provide consulting services that would present a conflict of interest with the Monitor's responsibilities under this Agreement and for five years following the termination of this Agreement, including being retained (on a paid or unpaid basis) by any current or future litigant or claimant, or such litigant's or claimant's attorney, in connection with a claim or suit against the City or the DOJ or their components, officers, agents or employees.

137. Neither the Monitor nor any person or entity hired or
     otherwise retained by the Monitor to assist in furthering
     any provision of this Agreement shall be liable for any
     claim, lawsuit, or demand arising out of the Monitor's
     performance pursuant to this Agreement. Provided, however,
     that this paragraph does not apply to any proceeding before
     a court related to performance of contracts or subcontracts
     for monitoring this Agreement.

C.   Compliance Reviews

138. In order to monitor and report on the City and the DPD's
     implementation of this Agreement, the Monitor, shall, inter
     alia, regularly conduct compliance reviews to ensure that
     the City and the DPD have implemented and continue to
     implement all measures required by this Agreement. The
     Monitor shall, where appropriate, employ sampling techniques
     to measure compliance.

139. Subject to the limitations set forth in this paragraph, the
     DPD shall reopen for further investigation any investigation
     the Monitor determines to be incomplete. The Monitor shall
     provide written instructions for completing any
     investigation determined to be incomplete. The Monitor
     shall exercise this authority so that any directive to
     reopen an investigation is given within a reasonable period
     following the investigation's conclusion. The Monitor may
     not exercise this authority concerning any investigation the
     disposition of which has been officially communicated to the
     officer who is the subject of the investigation.

140. The parties agree that the DPD shall hire and retain, or
     reassign a current DPD employee, for the duration of this
     Agreement, to serve as a full-time DPD Compliance
     Coordinator. The Compliance Coordinator shall serve as a
     liaison between the DPD, the Monitor and the DOJ, and shall
     assist with the DPD's compliance with this Agreement. The
     DPD shall select an individual with sufficient rank to
     mandate that tasks related to compliance are completed in a
     timely manner. At a minimum, the Compliance Coordinator
     shall: coordinate the DPD's compliance and implementation
     activities; facilitate the provision of data, documents and
     other access to DPD employees and material to the Monitor
     and the DOJ as needed; ensure that all documents and records
     are maintained as provided in this Agreement; and assist in
     assigning compliance tasks to DPD personnel, as directed by
     the Chief of Police or his or her designee. The DPD

39

Compliance Coordinator shall take primary responsibility for
the routine collection of information the Monitor requires
to carry out the provisions of this Agreement.

D.   Reports and Records

141. Within 120 days from the effective date of this Agreement,
and every three months thereafter until this Agreement is
terminated, the City shall file with the Monitor and the DOJ
a status report, including any supporting documentation,
delineating all steps taken during the reporting period to
comply with each substantive provision of this Agreement.

142. The Monitor shall file with the Court quarterly public
reports detailing the City's compliance with and
implementation of this Agreement.  The Monitor may issue
reports more frequently if the Monitor determines it
appropriate to do so.  These reports shall not include
information specifically identifying any individual officer.
Drafts of all status reports shall be provided to the DOJ
and the City at least 10 days prior to publication to afford
the parties an opportunity to identify factual errors.

143. During the term of this Agreement, and subject to record
retention requirements and procedures imposed by state or
local law, the City and the DPD shall maintain all records
documenting compliance with this Agreement and all documents
required by or developed pursuant to this Agreement.  The
City and the DPD shall maintain an officer's training
records during the officer's employment with the DPD and for
three years thereafter.

144. The City and the DPD shall provide the Monitor and the DOJ
with full and unrestricted access to all DPD and City staff,
facilities, and documents (including databases) that are
relevant to evaluate compliance with this Agreement, except
any documents protected by the attorney-client privilege
and/or work product doctrine.  Should the City decline to
provide the Monitor or the DOJ with access to a document
based on attorney-client privilege and/or the work product
doctrine, the City shall provide the Monitor and the DOJ
with a log describing the document.  The Monitor and the DOJ
shall retain any non-public information in a confidential
manner and shall not disclose any non-public information to
any person or entity, other than a party or the Monitor,
absent written notice to the City and either written consent
by the City or a court order authorizing disclosure.  This

40

Agreement does not authorize, nor shall it be construed to authorize, access to any DPD documents by persons or entities other than the DOJ, the City, and the Monitor.

E.    Implementation, Termination, and Enforcement

145. Within 90 days of the effective date of this Agreement, unless another time frame is specified in this Agreement, the City and the DPD shall implement each and every provision of this Agreement.

146. In regard to any provision that provides for "review and approval" by the DOJ, approval shall be granted in a timely fashion provided that the policy, protocol, plan, revision or other City or DPD action reasonably satisfies the requirements and standards set forth in the relevant provision(s).

147. Any revisions to DPD policies shall be provided to the DOJ within one week of their promulgation.

148. The Court shall retain jurisdiction of this action for all purposes during the term of this Agreement. The Agreement shall terminate five years after the effective date of the Agreement if the DPD and the City have substantially complied with each of the provisions of this Agreement and have maintained substantial compliance for at least two years. The burden shall be on the City to demonstrate that it is in substantial compliance with each of the provisions of the Agreement and has maintained substantial compliance for at least two years. Noncompliance with mere technicalities, or temporary failure to comply during a period of otherwise sustained compliance, shall not constitute failure to maintain substantial compliance. At the same time, temporary compliance during a period of otherwise sustained noncompliance shall not constitute substantial compliance.

149. The parties agree to defend the provisions of this Agreement. The parties shall notify each other of any court or administrative challenge to this Agreement.

150. Failure by the parties to enforce this entire Agreement or any provision thereof with respect to any deadline or any other provision herein shall not be construed as a waiver of its right to enforce other deadlines or provisions of this Agreement.

151. If any unforeseen circumstance occurs which causes a failure to timely carry out any requirements of this Agreement, the DPD and/or the City shall notify the DOJ in writing within 20 calendar days of the time that the DPD and/or the City becomes aware of the unforeseen circumstance and its impact on the DPD and/or the City's ability to perform under the Agreement. The notice shall describe the cause of the failure to perform and the measures taken to prevent or minimize the failure. The DPD and the City shall implement all reasonable measures to avoid or minimize any such failure.

152. In the event the DPD or the City fail to fulfill any obligation under this Agreement, the DOJ shall, prior to pursuing any remedy with the Court, give written notice of the failure to the DPD and the City. The DPD and the City shall have 30 days from receipt of such notice to cure the failure. However, if the DOJ determines that an emergency condition exists that places persons at risk of serious and imminent harm, the DOJ may immediately seek a remedial order from the Court. At the end of the 30-day period, in the event the DOJ determines that the failure has not been cured, the DOJ may, upon three days notice to the City (excluding weekends and federal or state holidays), at its election seek a remedy from the Court.

F. Miscellaneous

153. This Agreement shall be posted on the web sites of the City or the DPD and of the Special Litigation Section of the Civil Rights Division of the DOJ.

154. The City and the DPD agree that they shall not retaliate against any person because that person has filed or may file a complaint, provided information or assistance, or participated in any other manner in an investigation or proceeding relating to this Agreement.

IT IS SO ORDERED this 18th day of July, 2003.

UNITED STATES DISTRICT JUDGE

FOR PLAINTIFF:

JOHN ASHCROFT
Attorney General

JEFFREY G. COLLINS
MI Bar # P37260
United States Attorney
Eastern District of Michigan

RALPH F. BOYD, JR.
Assistant Attorney General
Civil Rights Division

PAMELA J. THOMPSON
MI Bar # P26056
Executive Assistant United
States Attorney
Eastern District of Michigan

SHANETTA Y. BROWN CUTLAR
Acting Chief
Special Litigation Section
Civil Rights Division

JUDITH E. LEVY
MI Bar # P55882
Assistant United States Attorney
Eastern District of Michigan
211 West Fort Street
Suite 2001
Detroit, MI 48226
Telephone: (313) 226-9501
Facsimile: (313) 226-4609

MAURA K. LEE
JOHN A. HENDERSON
Trial Attorneys
Special Litigation Section
Civil Rights Division
U.S. Department of Justice
Patrick Henry Building
950 Pennsylvania Avenue NW
Washington, DC 20530
Telephone: (202) 514-6255
Facsimile: (202) 514-4883

43

FOR DEFENDANTS:


_R. Carter (signature)_

RUTH C. CARTER
Corporation Counsel
City of Detroit


_Kwame M. Kilpatrick (signature)_

KWAME M. KILPATRICK
Mayor
City of Detroit


_Brenda E. Braceful (signature)_

BRENDA E. BRACEFUL
Deputy Corporation Counsel
1650 First National Building
660 Woodward Avenue
Detroit, MI  48226-3535
Telephone: (313) 224-4550
Facsimile: (313) 628-0299


_Jerry A. Oliver (signature)_

JERRY A. OLIVER, SR.
Chief of Police
City of Detroit


Dated: June 11, 2003