IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,              )
                                       )
            Plaintiff,                 )
                                       )
v.                                     )
                                       )          No.  03-72258
CITY OF DETROIT, MICHIGAN              )
and the DETROIT POLICE                 )          HON.  JULIAN ABELE COOK
DEPARTMENT,                            )
                                       )          MAGISTRATE JUDGE SCHEER
            Defendants.                )
                                       )

**Consent Judgment**
**Conditions of Confinement**

'03  JUL 18  P4:09

U.S. DISTRICT COURT CLERK
EAST. DIST. MICH
DETROIT

Table of Contents

I.      DEFINITIONS........................................  1

II.     GENERAL PROVISIONS................................  3

III.    FIRE SAFETY POLICIES.............................  6

IV.     EMERGENCY PREPAREDNESS POLICIES..................  7

V.      MEDICAL AND MENTAL HEALTH CARE POLICIES..........  8

VI.     PRISONER SAFETY POLICIES........................  10

VII.    ENVIRONMENTAL HEALTH AND SAFETY POLICIES........  11

VIII.   POLICIES CONCERNING PERSONS WITH DISABILITIES...  12

IX.     FOOD SERVICE POLICIES...........................  12

X.      PERSONAL HYGIENE POLICIES.......................  12

XI.     USE OF FORCE AND RESTRAINT POLICIES.............  13

XII.    INCIDENT DOCUMENTATION, INVESTIGATION AND REVIEW...  13

XIII.   EXTERNAL COMPLAINTS.............................  13

XIV.    GENERAL POLICIES................................  14

XV.     MANAGEMENT AND SUPERVISION......................  14

XVI.    TRAINING........................................  17

XVII.   MONITORING AND REPORTING........................  18

XVIII.  STIPULATION PURSUANT TO THE PRISON LITIGATION.....  23
        REFORM ACT, 18 U.S.C. § 3626

XIX.    IMPLEMENTATION AND ENFORCEMENT..................  24

XX.     MISCELLANEOUS...................................  25

I.  **DEFINITIONS**

1.  As used in this Agreement:

a.  The term "auditable form" or "auditable log" means a discrete record of the relevant information maintained separate and independent of blotters and other forms maintained by the DPD.

b.  The term "canine deployment" means any situation, except in cases involving an on-leash article search only, in which a canine is brought to the scene and either:  i) the canine is released from the police car in furtherance of the police action; or ii) the suspect gives up immediately after an announcement is made that if he/she does not surrender the canine will be released.

c.  The term "cell check" means direct visual observation of prisoners.

d.  The term "City" means the City of Detroit, including its agents, officers and employees.

e.  The term "Collective Bargaining Agreements" means the labor agreements by and between the City and the Detroit Police Officers Association, the Detroit Police Lieutenants and Sergeants Association, the Detroit Police Command Officers Association, the Police Officer Labor Council, and Local 2394 of the American Federation of State, County, and Municipal Employees in effect on the effective date of this Agreement.

f.  The term "detention officer" means both sworn and unsworn individuals employed by the DPD whose duties include the supervision and care of individuals in DPD custody.

g.  The term "DOJ" means the United States Department of Justice and its agents and employees.

h.  The term "DPD" means the Detroit Police Department, its agents and its employees (both sworn and unsworn).

i.  The term "effective date" means the day this Agreement is entered by the Court.

j.  The term "force" means the following actions by an officer: any physical strike or instrumental contact with a person; any intentional attempted physical strike or instrumental contact that does not take effect; or any significant

1

physical contact that restricts the movement of a person.
The term includes the discharge of firearms; the use of
chemical spray, choke holds or hard hands; the taking of a
subject to the ground; or the deployment of a canine. The
term does not include escorting or handcuffing a person,
with no or minimal resistance. Use of force is lawful if it
is objectively reasonable under the circumstances and the
minimum amount of force necessary to effect an arrest or
protect the officer or other person.

k.    The term "holding cell" means any room or area in which
individuals in DPD custody are confined, including cells at
the DPD precinct stations, specialized units, and the
Detroit Receiving Hospital.

l.    The term "Holding Cell Compliance Committee" means the
component of the DPD responsible for assuring compliance
with requirements of this Agreement.

m.    The term "IAD" means the section of the DPD that
investigates serious uses of force and allegations of
criminal misconduct by DPD employees.

n.    The term "including" means "including, but not limited to."

o.    The term "injury" means any impairment of physical condition
or pain.

p.    The term "Life Safety Code" means the version of the fire
safety code promulgated by the National Fire Protection
Association and adopted by the State of Michigan and the
City of Detroit. See Ron Cote, National Fire Protection
Association, Life Safety Code 101.

q.    The term "Monitor" means the individual or group of
individuals selected to oversee and evaluate the City and
the DPD's implementation of and compliance with this
agreement.

r.    The term "parties" means the DOJ, the City and the DPD.

s.    The term "prisoner" means any individual in DPD custody.

t.    The term "qualified dietician" means an individual who is
registered with the American Dietetic Association to deliver
the dietetic services they have undertaken to provide.

u.  The term "qualified medical professional" means an individual who is currently licensed by the State of Michigan to deliver the health care services they have undertaken to provide.

v.  The term "qualified mental health professional" means an individual who is currently licensed by the State of Michigan to deliver the mental health services they have undertaken to provide.

w.  The term "qualified sanitarian" means an individual who is either registered with the National Environmental Health Association or is licensed by the State of Michigan to deliver the environmental consulting services they have undertaken to provide.

x.  The term "shall" means that the provision imposes a mandatory duty.

y.  The term "supervisor" means a sworn DPD employee at the rank of sergeant or above and non-sworn employees with oversight responsibility for DPD employees.

## II. GENERAL PROVISIONS

2.  This Agreement is effectuated pursuant to the authority granted the DOJ under the Violent Crime Control and Law Enforcement Act of 1994, 42 U.S.C. § 14141 ("Section 14141"), to seek declaratory or equitable relief to remedy a pattern or practice of conduct by law enforcement officers that deprives individuals of rights, privileges or immunities secured by the Constitution or federal law.

3.  In its Complaint, the United States alleges that the City and the DPD are engaging in a pattern or practice of unconstitutional or otherwise unlawful conduct that has been made possible by the failure of the City and the DPD to adopt and implement proper management practices and procedures.

4.  This Court has jurisdiction of this action under 28 U.S.C. §§ 1331 and 1345. Venue is proper in the Eastern District of Michigan pursuant to 28 U.S.C. § 1391.

5.  This Agreement resolves all claims in the United States' Complaint filed in this case concerning allegations of a pattern or practice of conduct resulting in unconstitutional or otherwise unlawful conditions of confinement in DPD holding cells by DPD officers, employees or agents in

3

violation of 42 U.S.C. § 14141. The DOJ, the City and the DPD have resolved the DOJ's claims regarding use of force and arrest and detention policies and practices in a separate Agreement, to be filed concurrently with this Complaint and Agreement with the United States District Court for the Eastern District of Michigan.

6. In September 2000, the Mayor of Detroit and other interested persons requested that the DOJ review the DPD's use of force. This request indicated the City's commitment to minimizing the risk of excessive use of force in the DPD and to promoting police integrity. Based, in part, on these requests, the DOJ initiated an investigation in December 2000, of the use of force and conditions in DPD holding cells pursuant to its authority under Section 14141. The investigation was expanded in May 2001, to include the DPD's arrest and detention policies and practices.

7. DOJ's investigation was conducted with the full cooperation of the City. During the investigation, in keeping with the Attorney General's pledge to provide technical assistance, the DOJ made recommendations for changes in the DPD's policies and procedures regarding use of force, conditions in DPD holding cells, and arrest and detention in the form of three technical assistance letters of March 6, 2002, April 4, 2002 and June 5, 2002, several meetings with the Chief of Police and DPD command staff regarding the substance of the technical assistance letters, and participation in working groups created by the DPD to facilitate reform. The DPD is currently in the process of revising its policies and procedures to address the issues identified by the DOJ. The DOJ and the City believe this Agreement, rather than contested litigation, represents the best opportunity to address the DOJ's concerns.

8. Nothing in this Agreement is intended to alter the lawful authority of the DPD to use reasonable and necessary force, effect arrests and file charges, conduct searches or make seizures, or otherwise fulfill its law enforcement obligations in a manner consistent with the requirements of the Constitutions and laws of the United States and the State of Michigan.

9. Nothing in this Agreement is intended to alter the Collective Bargaining Agreements or impair the collective bargaining rights of employees under State and local law. Nothing in this Agreement is intended to amend or supercede any provision of State or local law, including the City Charter. The DOJ and the City have attempted to draft this Agreement to avoid impairing the rights of the Detroit

4

Police Officers Association, the Detroit Police Lieutenants and Sergeants Association, the Detroit Police Command Officers Association, the Police Officer Labor Council, and Local 2394 of the American Federation of State, County, and Municipal Employees under the Collective Bargaining Agreements. However, a determination that any such right is impaired shall not excuse the City and the DPD from a failure to implement any provision of this Agreement.

10. This Agreement shall constitute the entire integrated agreement of the parties regarding the conditions of confinement in the DPD holding cells. With the exception of the technical assistance letters described in paragraph 7, no prior drafts or prior or contemporaneous communications, oral or written, shall be relevant or admissible for purposes of determining the meaning of any provisions herein in any litigation or any other proceeding.

11. This Agreement is binding upon the parties, by and through their officials, agents, employees, and successors. The parties are interested in providing clear lines of authority: In the event of a dispute among officials, agents, employees, or agencies of the City, the Mayor of Detroit is the final authority on behalf of the City as it pertains to this Agreement. This Agreement is enforceable only by the parties. No person or entity is intended to be a third-party beneficiary of the provisions of this Agreement for purposes of any civil, criminal, or administrative action, and accordingly, no person or entity may assert any claim or right as a beneficiary or protected class under this Agreement. This Agreement is not intended to impair or expand the right of any person or organization to seek relief against the City or its officials, employees or agents for their conduct or the conduct of DPD officers; accordingly, it does not alter legal standards governing any such claims, including those under Michigan law. This Agreement does not authorize, nor shall it be construed to authorize, access to any City, DPD or DOJ documents by persons or entities other than the Court, the DOJ, the City, and the Monitor.

12. The City is responsible for providing necessary support to the DPD to enable it to fulfill its obligations under this Agreement.

13. The City, by and through its officials, agents, employees and successors, is enjoined from engaging in a pattern or practice of conduct by employees of the DPD that deprives persons of rights, privileges, or immunities secured or protected by the Constitution or laws of the United States.

## III. FIRE SAFETY POLICIES

14. The DPD shall ensure that all holding cells, and buildings that contain them, achieve and maintain compliance with the Life Safety Code within one year of the effective date of this Agreement.  The City shall ensure that the Detroit Fire Marshal conducts regular and periodic inspections to evaluate whether the conditions in DPD holding cells, and buildings that contain them, are in compliance with the Life Safety Code.

15. The DPD shall develop and implement a comprehensive fire detection, suppression and evacuation program for the holding cells, and buildings that contain them, in accordance with the requirements of the Life Safety Code and in consultation with the Detroit Fire Department.

16. The fire safety program shall be developed in consultation with and receive written approval by the Detroit Fire Department.  As part of developing the fire safety program, the Detroit Fire Department shall evaluate the need for and, if necessary, the DPD shall install:  fire-rated separations, smoke detection systems, smoke control systems, sprinkler systems and/or emergency exits for the holding cells and buildings that contain them.  The fire safety program shall be submitted for review and approval of the DOJ within three months of the effective date of this Agreement.

17. The DPD shall implement the fire safety program within one year of the effective date of this Agreement.  Thereafter, the program shall be reviewed and approved in writing by the Detroit Fire Department at least every year, or prior to any revisions to the plan.

18. The DPD shall take immediate interim fire safety measures in all buildings that contain holding cells.  At a minimum, these interim measures shall:

    a.  ensure that the activation of any individual smoke alarm sounds an alarm throughout the building;
    b.  ensure that prisoners in holding cells have an adequate means of reporting emergency conditions to DPD staff immediately;
    c.  ensure that automated back-up power systems exist for all buildings containing holding cells that are capable of providing immediate power for emergency lighting, exit signs, fire alarm and smoke detection systems in the event of an electrical power failure through batteries or an emergency generator; and

d.  reduce the likely spread of smoke and fire throughout
    the buildings by means of stairwells, garages,
    hazardous rooms and exposed pipes, such as ensuring
    that fire doors in stairwells are closed.

19. The DPD shall ensure that fire safety equipment is routinely
    tested, inspected and maintained, including the sprinkler
    systems, fire alarm systems, manual fire extinguishers,
    emergency lighting and exit signs, and self-contained
    breathing apparatuses.

20. The DPD shall enforce immediately its no-smoking policy in
    the holding cells or provide ash trays and ensure that all
    holding cells areas are constructed and supplied with fire-
    rated materials.

21. The DPD shall ensure immediately that all flammable and
    combustible liquids in holding cell areas and the attached
    and nearby DPD buildings are stored properly.

22. The DPD shall remove immediately all highly-combustible kane
    fiber ceiling tiles from all buildings that contain holding
    cells.

IV.  EMERGENCY PREPAREDNESS POLICIES

23. The DPD shall ensure a reasonable level of safety and
    security of all staff and prisoners in the event of a fire
    or other emergency.

24. The DPD shall develop a comprehensive emergency preparedness
    program that is approved in writing by the Detroit Fire
    Department.  This program shall be submitted for review and
    approval of the DOJ within three months of the effective
    date of this Agreement.  The DPD shall implement the program
    within three months of DOJ's review and approval.
    Thereafter, the program shall be reviewed and approved in
    writing by the Detroit Fire Department at least every year,
    or prior to any revisions to the plan.  At a minimum, the
    emergency preparedness program shall:

    a.  include an emergency response plan for each building
        that contains holding cells identifying staff
        responsibilities in the event of fire-related
        emergencies and other emergencies, including
        notification responsibilities, evacuation procedures
        and key control procedures (discussed below); and
    b.  require performance and documentation of fire drills
        for all buildings containing holding cells on all
        shifts every six months (documentation shall include
        the start and stop times of each drill, the staff

7

members who participated in the drill, a summary of the
drill, and an evaluation of the success of the drill).

25.   The DPD shall develop and implement key control policies and
procedures that ensure that all staff are able to manually
unlock all holding cell doors in the event of a fire or
other emergency.  At a minimum, the key control policies and
procedures shall:

   a.   provide for emergency identification of keys by touch;
and
   b.   require routine inventory, testing and maintenance of
keys and locks.

## V.   MEDICAL AND MENTAL HEATH CARE POLICIES

26.   The DPD shall ensure the appropriate identification of and
response to prisoner's medical and/or mental health
conditions.

27.   The DPD shall develop a comprehensive medical and mental
health screening program that shall be approved in writing
by qualified medical and mental health professionals.  This
program shall be submitted for review and approval of the
DOJ within three months of the effective date of this
Agreement.  The DPD shall implement the program within three
months of DOJ's review and approval.  Thereafter, the
program shall be reviewed and approved in writing by
qualified medical and mental health professionals at least
every year and prior to any revisions to the program.  At a
minimum, the comprehensive medical and mental health
screening program shall include prisoner screening
procedures and medical protocols.

28.   The prisoner screening procedure, at a minimum, shall:

   a.   enable the DPD to identify individuals with medical or
mental health conditions, including infectious
diseases, chronic conditions, disabilities, ambulatory
impairments, mental health conditions, and drug/alcohol
withdrawal;
   b.   identify persons who are at risk of committing suicide,
persons who have been on heightened observation for
suicide risk at any time during a past incarceration
and persons who have any medical contraindications for
the use of chemical sprays;
   c.   require that the DPD follow a standard intake procedure
for each individual entering DPD custody;
   d.   require that intake screening be conducted within two
hours of intake and through a verbal exchange between
the DPD and prisoners; and

8

     e.    incorporate all health information pertaining to a prisoner acquired by the arresting or transporting officers.

29.   The medical protocols, at a minimum, shall:

     a.    identify the specific actions the DPD shall take in response to the medical information acquired during prisoner screening or detention, including the need for emergency care, hospitalization, prescription medication and/or intensive monitoring; and

     b.    require prior supervisory review and written approval, absent exigent circumstances, of all decisions made in response to acquired medical information.

30.   The DPD shall develop and implement a policy regarding infectious disease control in consultation with medical health professionals. The policy shall be reviewed and approved in writing by qualified medical health professionals at least every year after implementation and prior to any revisions to the policy. At a minimum, the policy shall:

     a.    establish appropriate housing for prisoners believed to have infectious diseases; and

     b.    mandate measures the DPD shall take to prevent the spread of infectious diseases, including proper handling and disposal of bio-hazardous material.

31.   The DPD shall develop and implement a protocol for updating and exchanging prisoner health information. At a minimum, this protocol shall:

     a.    require that prisoner health information is recorded at intake and is thereafter immediately and readily available to all relevant medical and transporting personnel in a manner consistent with the relevant federal and state confidentiality statutes;

     b.    require that prisoner health information is continually updated to incorporate any additional relevant information acquired during his/her detention;

     c.    require that relevant prisoner health information is documented and communicated between consecutive shifts, such as whether a prisoner is taking medication or has a medical condition; and

     d.    require that prisoner health information travel with prisoners who are transferred to another facility.

32.   The DPD shall develop a prescription medication policy in consultation with qualified medical and mental health professionals that ensures prisoners are provided

prescription medication as directed.  The policy shall be approved in writing by qualified medical and mental health professionals and shall be submitted for review and approval of the DOJ within three months of the effective date of this Agreement.  The DPD shall implement the policy within three months of the DOJ's review and approval.  Thereafter, the policy shall be reviewed and approved in writing by qualified medical and mental health professionals at least annually and prior to any revisions to the program.  At a minimum, the policy shall:

a. indicate when the DPD shall convey prisoners taking prescription medication to the DRH or other treating hospital for evaluation;

b. require the DPD distribute to prisoners only medications that have been prescribed at the DRH or other treating hospitals;

c. require that the DPD distribute medications as prescribed and not rely on inmates to identify their need for medication;

d. require that all prisoner medications be stored in a secure location near the holding cells and travel with prisoners that are transferred;

e. require the DPD to record relevant information regarding the administration of prescription medication on an auditable form;

f. require that injected medications are administered as prescribed and in a safe and hygienic manner; and

g. require that unused medications prescribed at the DRH or other treating hospitals are provided to prisoners upon their release.

33. The DPD shall provide appropriate clothing, such as paper gowns or suicide smocks, to all prisoners placed under suicide precautions.

34. The DPD shall remove or make inaccessible all suicide hazards in holding cells including exposed pipes, radiators and overhead bars.

## VI. PRISONER SAFETY POLICIES

35. The DPD shall ensure a reasonable level of safety of staff and prisoners through the use of appropriate security administration procedures.

36. The DPD shall develop and implement a prisoner security screening program for all buildings containing holding cells.  At a minimum, the program shall:

a.   establish protocols based upon objective, behavior-based criteria for identifying suspected crime partners, vulnerable or special management prisoners who should be housed in observation cells or single-occupancy cells; and

b.   require that security screening information is documented and communicated between consecutive shifts.

37.   The DPD shall develop and implement procedures for the performance, documentation and review of routine cell checks in all holding cells to ensure safe housing.  At a minimum, these procedures should:

a.   require that cell checks on the general population are performed at least twice per hour and that cell checks on prisoners in observation cells and DRH holding cells are performed every 15 minutes, unless constant supervision is required; and

b.   require detention officers to document relevant information regarding the performance of cell checks in an auditable log.

38.   The DPD shall record in a written policy and implement a procedure that requires detention officers to provide continual direct or on-site remote observation of all observation cells while they are occupied.

## VII.  ENVIRONMENTAL HEALTH AND SAFETY POLICIES

39.   The DPD shall ensure that all holding cells are cleaned immediately and thereafter are maintained in a clean and sanitary manner.

40.   The DPD shall design and implement a cleaning policy for all holding cells.  The policy shall require routine cleaning and supervisory inspection of the holding cells and nearby areas.

41.   The DPD shall design and implement a maintenance policy for all holding cells that requires timely performance of routine maintenance and the documentation of all maintenance requests and responses in an auditable log.

42.   The DPD shall provide adequate heating and ventilation for all buildings containing holding cells.

43.   The DPD shall repair all broken or malfunctioning lighting, toilets, sinks and windows in holding cells and observation cells.

44.  The DPD shall ensure that lighting in all cell block areas
     is sufficient to reach 20 foot-candles of illumination at
     desk level and in personal grooming areas.

45.  The DPD shall provide all prisoners with reasonable access
     to toilets and potable water 24 hours-a-day.

46.  The DPD shall ensure that all Hepa-Aire purifiers comply
     with the Michigan Occupational Safety and Health Agency
     standards.

**VIII.  POLICIES CONCERNING PERSONS WITH DISABILITIES**

47.  The DPD shall ensure that persons with disabilities are
     provided with reasonable accommodations.

48.  The DPD shall develop and implement a policy concerning the
     detention of individuals with disabilities in consultation
     with qualified medical and mental health professionals.  The
     policy shall be approved in writing by qualified medical and
     mental health professionals.  Thereafter, the program shall
     be reviewed and approved in writing by qualified medical and
     mental health professionals at least every year and prior to
     any revisions to the program.

**IX.  FOOD SERVICE POLICIES**

49.  The DPD shall ensure food is stored and served in a sanitary
     manner and in compliance with state and local health codes.

50.  The DPD shall develop and implement a food service policy
     that shall be approved in writing by a qualified sanitarian.
     At a minimum, the food service policy shall:

     a.  require that the meal plan is initially approved in
         writing by a qualified dietician and, thereafter, is
         reviewed and approved in writing by a qualified
         dietician at least every year, or prior to any
         revisions to the program;
     b.  require that all food is stored and handled in a
         sanitary manner;
     c.  ensure that all prisoners are provided with an
         alternative meal if they are unable to eat the standard
         meal for religious or dietary reasons; and
     d.  ensure that food service is provided to all prisoners
         who are held over six hours.

**X.  PERSONAL HYGIENE POLICIES**

51.  The DPD shall ensure that personal hygiene items are made
     available as needed.  Available hygiene items should

include: soap, toothbrushes, toothpaste, toilet paper, a comb, deodorant, and feminine hygiene products. The DPD shall implement this provision within one month of the effective date of this Agreement.

## XI. USE OF FORCE AND RESTRAINTS POLICIES

52. The DPD shall require that any use of force on prisoners in holding cells complies with the DPD's use of force policies and procedures.

53. The DPD shall revise and augment its policies regarding prisoners to require that:

   a.  officers utilize appropriate precautions when interacting with a prisoner who has previously demonstrated he or she is recalcitrant or resistant, including: summoning additional officers; summoning a supervisor; and using appropriate restraints;
   b.  absent exigent circumstances, officers notify a supervisor before using force on a prisoner who is confined to a cell; and
   c.  the supervisor assess the need to use force on a prisoner who is confined to a cell, direct any such use of force and ensure the incident is videotaped.

54. The DPD shall not handcuff prisoners to benches for longer periods of time than are necessary.

## XII. INCIDENT DOCUMENTATION, INVESTIGATION AND REVIEW

55. The DPD shall require that all uses of force, injuries to prisoners and in-custody deaths occurring in the DPD holding cells are investigated in compliance with the DPD's general incident investigation policies.

56. The DPD shall require that all uses of force occurring in DPD holding cells are reported and investigated in compliance with the DPD's use of force investigation policies.

57. The DPD shall require that all injuries to prisoners occurring in DPD holding cells are reported and investigated in compliance with the DPD's prisoner injury investigation policies.

## XIII. EXTERNAL COMPLAINTS

58. The DPD shall ensure that it accepts and processes all external complaints regarding incidents occurring in holding cells consistent with the DPD's external complaint policies.

59. The DPD shall ensure that all external complaints it receives regarding incidents occurring in holding cells are investigated and reviewed consistent with the DPD's policies concerning external complaint investigations and review.

## XIV.  GENERAL POLICIES

60. In developing, revising, and augmenting the policies discussed in this Agreement, the DPD shall ensure that all terms are clearly defined.

61. The DPD shall continue to make available proposed policy revisions to the community, for review, comment and education.  Such policy revisions shall also be published on the DPD's website to allow comments to be provided directly to the DPD.

## XV.  MANAGEMENT AND SUPERVISION

62. The DPD shall routinely evaluate the operation of the holding cells to minimize the risk of harm to staff and prisoners.

63. The DPD shall operate the holding cells in compliance with the DPD's comprehensive risk management plan including implementation of:

    a.   the risk management database;
    b.   the performance evaluation system;
    c.   the auditing protocol;
    d.   regular and periodic review of all DPD policies; and
    e.   regular meetings of DPD management to share information and evaluate patterns of conduct by DPD that potentially increase the DPD's liability.

64. The DPD policy on video cameras shall be revised and augmented to require:

    a.   the installation and continuous operation of video cameras in all prisoner processing areas of DPD holding cells within one year of the effective date of this Agreement;
    b.   supervisors to review videotapes of all incidents involving injuries to a prisoner or an officer, uses of force and external complaints;
    c.   that the DPD retain and preserve videotapes for at least 90 days, or as long as necessary for incidents to be fully investigated; and
    d.   that the DPD conduct and document periodic random reviews of prisoner processing area camera videotapes for training and integrity purposes and conduct

14

periodic random surveys of prisoner processing area
video recording equipment to confirm that it is in
proper working order.

65. The DPD shall conduct regularly scheduled quarterly audits,
covering all DPD units and commands that investigate uses of
force, injuries to prisoners and allegations of misconduct
in holding cells, including:

   a. reviewing a sample of command, IAD, and Homicide
      Section investigations;
   b. evaluating whether the actions of the officer and the
      subject were captured correctly in the investigative
      report;
   c. evaluating the preservation and analysis of the
      evidence;
   d. examining whether there is consistency in use of force
      and injured prisoner investigations throughout the DPD;
   e. evaluating the appropriateness of the investigator's
      conclusions; and
   f. issuing a written report regarding the findings of the
      audit.

66. The DPD shall create a Holding Cell Compliance Committee
that is responsible for assuring compliance with
requirements of this Agreement.  The Holding Cell Compliance
Committee shall conduct regularly scheduled quarterly audits
in all buildings containing holding cells to evaluate
compliance with the fire detection, suppression and
evacuation program, including:

   a. testing a sample of smoke detectors and sprinklers;
   b. testing the back-up power systems;
   c. reviewing a sample of fire equipment testing and
      maintenance records; and
   d. issuing a written report regarding the findings of the
      audit.

67. The Holding Cell Compliance Committee shall conduct
regularly scheduled quarterly audits in all buildings
containing holding cells to evaluate emergency preparedness,
      including:

   a. reviewing a sampling of key and fire equipment
      maintenance and inventory records;
   b. interviewing selected detention officers about their
      participation in fire drills and on their
      responsibilities under the emergency preparedness
      program and testing their ability to identify keys
      necessary to unlock all holding cell doors; and
   c. issuing a written report regarding the findings of the
      audit.

15

68. The Holding Cell Compliance Committee shall conduct regularly scheduled quarterly audits in all buildings containing holding cells to evaluate the medical/mental health programs and policies, including:

    a.    reviewing a sampling of hospital referral forms in comparison to prisoner intake forms to evaluate the accuracy of the intake screening and whether appropriate action was taken;

    b.    observing intake screening interviews to assess thoroughness;

    c.    reviewing a sampling of the prescription medication log to ensure that medications were administered as prescribed and that their distribution was accurately recorded; and

    d.    issuing a written report regarding the findings of the audit.

69. The Holding Cell Compliance Committee shall conduct regularly scheduled quarterly audits in all buildings containing holding cells to evaluate the detainee safety programs and policies, including:

    a.    reviewing a sampling of security screening records, including written supervisory approvals, to ensure that prisoners are being properly screened and housed;

    b.    reviewing a sampling of the cell checks logs to ensure that checks are being accurately and regularly performed and that cell check logs are receiving supervisory review and written approval; and

    c.    issuing a written report regarding the findings of the audit.

70. The Holding Cell Compliance Committee shall conduct regularly scheduled quarterly audits in all buildings containing holding cells to evaluate the environmental health and safety programs, including:

    a.    inspecting holding cells and surrounding areas to ensure that they are clean and clear of debris and that the lighting, sinks and toilets are operable;

    b.    reviewing a sampling of cleaning and maintenance logs to ensure they are properly maintained and reflect the scheduled performance of the requisite cleaning and maintenance tasks;

    c.    reviewing the systems in place for assuring that all prisoners have reasonable access to potable water and toilets 24 hours a day;

    d.    observing whether holding cells are free of any potential suicide hazards; and

     e.    issuing a written report regarding the findings of the audit.

71.    The Holding Cell Compliance Committee shall conduct regularly scheduled quarterly audits of all buildings containing holding cells to evaluate the food service program, including:

     a.    reviewing a sample of food service documentation to evaluate whether prisoners who are held over six hours receive regular and adequate meals;

     b.    assuring that food is handled in a sanitary manner; and

     c.    issuing a written report regarding the findings of the audit.

72.    The DPD shall issue all audit reports to the Chief of Police and also provide copies to each precinct or specialized unit commander.  The commander of each precinct and specialized unit shall review all audit reports regarding employees under their command and, if appropriate, shall take non-disciplinary corrective action or disciplinary action.

## XVI. TRAINING

73.    The DPD shall provide comprehensive pre-service and in-service training to all detention officers.  .

74.    The DPD shall create and maintain individual training records for all detention officers, documenting the date and topic of all pre-service and in-service training completed for all training completed on or after the effective date of this Agreement.

75.    The DPD shall provide all detention officers, supervisors of detention officers and members of the Holding Cell Compliance Committee with annual training in emergency preparedness.  Such training shall include drills and substantive training in the following topics:

     a.    emergency response plans and notification responsibilities;

     b.    fire drills and use of fire extinguishers and other fire suppression equipment;

     c.    key control drills and key control policies and procedures; and

     d.    responding to emergency situations, including scenarios detention officers likely will experience.

76.    The DPD shall provide all detention officers, supervisors and members of the Holding Cell Compliance Committee with annual training in the medical/mental health screening programs and policies.  Such training shall include and address the following topics:

a.   prisoner intake procedures and medical and mental
     health protocols, including protocols for transferring
     or housing prisoners with infectious diseases,
     disabilities and/or requiring increased monitoring;
b.   recording, updating and transferring prisoner health
     information and medications;
c.   the prescription medication policy, including
     instructions on the storage, recording and
     administration of medications; and
d.   examples of scenarios faced by detention officers
     illustrating proper intake screening and action in
     response to information regarding medical and mental
     health conditions.

77.  The DPD shall provide all detention officers,
     supervisors and members of the Holding Cell Compliance
     Committee with annual training in detainee safety programs
     and policies.  Such training shall include and address the
     following topics:

a.   the security screening program, including protocols for
     identifying and promptly and properly housing suspected
     crime partners, vulnerable, assaultive or special
     management prisoners;
b.   protocols for performing, documenting and obtaining
     supervisory review of holding cell checks;
c.   protocols concerning prisoners in observation cells,
     including protocols for direct and continual
     supervision, for spotting potential suicide hazards and
     providing appropriate clothing; and
d.   examples of scenarios faced by detention officers
     illustrating appropriate security screening,
     segregation and monitoring techniques.

78.  The DPD shall provide all detention officers, supervisors
     and members of the Holding Cell Compliance Committee with
     annual training in environmental health and safety and
     hygiene.  Such training shall include and address the
     following topics:

a.   cell block cleaning and maintenance protocols; and
b.   sanitary food preparation and delivery protocols.

## XVII.  MONITORING AND REPORTING

A.   Selection of the Monitor

79.  The DOJ and the City shall select a Monitor with corrections
     experience, a reputation for integrity and an absence of
     bias, including any appearance of bias, for or against the
     DOJ, the City or the DPD, who shall review and report on the
     City and the DPD's implementation of this Agreement:

18

    a.    If the DOJ and the City have not agreed upon a Monitor prior to the effective date of this Agreement, then within 60 days of the effective date of this Agreement, the DOJ, together with the City, jointly shall issue a solicitation for bid proposals for appointment as the Monitor.  In addition to a targeted national mailing, the solicitation shall be published in several national newspapers, and the web sites of the City and the DOJ. The City shall bear the cost of publicizing the solicitation.

    b.    The deadline for the submission of such proposals shall be 30 days after publication of the solicitation on the City's website.

    c.    All proposals for appointment as the Monitor under this provision shall include plans for experts to be utilized, resumes and curriculum vitae of proposed experts, cost proposals and any other information that the City and the DOJ deem necessary.

80.    The DOJ, the City and the DPD have resolved the DOJ's claims regarding the use of force and arrest and witness detention policies and practices in a separately filed Agreement. That Agreement also requires the selection of a Monitor to review and report on the City and the DPD's implementation of that Agreement.  The parties recognize that one person, or team of people, may be selected to fulfill both monitoring roles or that separate Monitors may be selected. If separate Monitors are selected, the Monitors shall confer and coordinate their efforts on issues that overlap both Agreements.

81.    If the City and the DOJ are unable to agree on a Monitor prior to or within 180 days of the effective date of this Agreement, the City and the DOJ shall submit two names of persons or teams of people with corrections experience, a reputation for integrity and an absence of bias, including any appearance of bias, for or against the DOJ, the City or the DPD, along with resumes or curriculum vitae and cost proposals, to the Court, and the Court shall appoint the Monitor from among the names of qualified persons submitted.

82.    In the interest of expediting the selection and contracting processes for the Monitor, the City and the DOJ shall be exempt from local contracting procurement regulations and all such regulations shall be considered waived for this purpose.

83.    The Monitor, at any time after the initial selection of the person or team of persons as the Monitor, may request to be allowed to hire or employ such additional persons or entities as are reasonably necessary to perform the tasks assigned to him or her by this Agreement.  Any person or

19

entity hired or otherwise retained by the Monitor to assist
in furthering any provisions of this Agreement shall be
subject to the provisions of paragraphs 90, 91 and 99,
governing testifying, conflicting employment and
confidentiality.  The Monitor shall notify the City and the
DOJ in writing if the Monitor wishes to select such
additional persons or entities.  The notice shall identify
and describe the qualifications of the person or entity to
be hired or employed and the monitoring task to be
performed.  If the City and the DOJ agree to the Monitor's
proposal, the Monitor shall be authorized to hire or employ
such additional persons or entities.  The City or the DOJ
have ten days to disagree with the proposal.  If the City
and the DOJ are unable to reach agreement within ten days of
receiving notice of the disagreement, the Court shall
resolve the dispute.

84.  The City shall bear all reasonable fees and costs of the
     Monitor and any persons hired or employed pursuant to
     paragraph 83.  The Court retains the authority to resolve
     any dispute that may arise regarding the reasonableness of
     fees and costs charged by the Monitor.  In selecting the
     Monitor, the City and the DOJ recognize the importance of
     ensuring that the fees and costs borne by the City are
     reasonable, and accordingly, fees and costs shall be one
     factor considered in selecting the Monitor.  In the event
     that any dispute arises regarding the payment of the
     Monitor's fees and costs, the City, the DOJ, and the Monitor
     shall attempt to resolve such disputes cooperatively.  If
     the City, the DOJ and the Monitor are unable to reach
     agreement, the Court shall resolve the dispute.

85.  The Monitor shall not be subject to dismissal except by the
     Court upon motion of the City or the DOJ and a showing of
     good cause.

B.   Duties of the Monitor

86.  The Monitor shall be an agent of the Court and shall be
     subject to the supervision and orders of this Court,
     consistent with this Agreement.  The Monitor shall only have
     the duties, responsibilities and authority conferred by this
     Agreement.  The Monitor shall not, and is not intended to,
     replace or take over the role and duties of any City or DPD
     employee.  The Monitor may not modify, amend, diminish or
     expand this Agreement.

87.  The Monitor shall offer the parties technical assistance
     regarding compliance with this Agreement.  Technical
     assistance shall be provided to a party upon request and it
     shall be offered consistent with the provisions of this

Agreement.  In monitoring the implementation of this
Agreement, the Monitor shall maintain regular contact with
the parties.

88.  In order to monitor and report on the City and the DPD's
implementation of each substantive provision of this
Agreement, the Monitor shall conduct the compliance reviews
specified in paragraph 93 of this Agreement and such
additional reviews as the Monitor deems appropriate.  The
Monitor may make recommendations to the parties regarding
measures necessary to ensure full and timely implementation
of this Agreement.

89.  To assist the parties and the Court in assessing the City
and the DPD's implementation of each substantive provision
of this Agreement, the Monitor shall prepare the reports
specified in paragraph 97 of this Agreement and such
additional reports as the Monitor deems appropriate.

90.  The Monitor may testify in this case regarding any matter
relating to the implementation, enforcement, or dissolution
of this Agreement.  The Monitor shall not testify in any
other litigation or proceeding with regard to any act or
omission of the City, the DPD, or any of their agents,
representatives, or employees related to this Agreement or
regarding any matter or subject that the Monitor may have
received knowledge of as a result of his or her performance
under this Agreement.  The Monitor shall not issue
statements or make findings with regard to any act or
omission of the City, the DPD, or their agents or
representatives, except as required by the provisions of
this Agreement.

91.  Unless such conflict is waived by the parties, the Monitor
shall not accept employment or provide consulting services
that would present a conflict of interest with the Monitor's
responsibilities under this Agreement and for five years
following the termination of this Agreement, including being
retained (on a paid or unpaid basis) by any current or
future litigant or claimant, or such litigant's or
claimant's attorney, in connection with a claim or suit
against the City or the DOJ or their components, officers,
agents or employees.

92.  Neither the Monitor nor any person or entity hired or
otherwise retained by the Monitor to assist in furthering
any provision of this Agreement shall be liable for any
claim, lawsuit, or demand arising out of the Monitor's
performance pursuant to this Agreement.  Provided, however,
that this paragraph does not apply to any proceeding before
a court related to performance of contracts or subcontracts
for monitoring this Agreement.

21

C.    Compliance Reviews

93.    In order to monitor and report on the City and the DPD's
       implementation of this Agreement, the Monitor, shall, inter
       alia, regularly conduct compliance reviews to ensure that
       the City and the DPD have implemented and continue to
       implement all measures required by this Agreement.   The
       Monitor shall, where appropriate, employ sampling techniques
       to measure compliance.

94.    Subject to the limitations set forth in this paragraph, the
       DPD shall reopen for further investigation any investigation
       the Monitor determines to be incomplete.   The Monitor shall
       provide written instructions for completing any
       investigation determined to be incomplete.   The Monitor
       shall exercise this authority so that any directive to
       reopen an investigation is given within a reasonable period
       following the investigation's conclusion.   The Monitor may
       not exercise this authority concerning any investigation the
       disposition of which has been officially communicated to the
       officer who is the subject of the investigation.

95.    The parties agree that the DPD shall hire and retain, or
       reassign a current DPD employee, for the duration of this
       Agreement, to serve as a full-time DPD Compliance
       Coordinator.   The Compliance Coordinator shall serve as a
       liaison between the DPD, the Monitor and the DOJ, and shall
       assist with the DPD's compliance with this Agreement.   The
       DPD shall select an individual with sufficient rank to
       mandate that tasks related to compliance are completed in a
       timely manner.   At a minimum, the Compliance Coordinator
       shall:   coordinate the DPD's compliance and implementation
       activities; facilitate the provision of data, documents and
       other access to DPD employees and material to the Monitor
       and the DOJ as needed; ensure that all documents and records
       are maintained as provided in this Agreement; and assist in
       assigning compliance tasks to DPD personnel, as directed by
       the Chief of Police or his or her designee.   The DPD
       Compliance Coordinator shall take primary responsibility for
       the routine collection of information the Monitor requires
       to carry out the provisions of this Agreement.

D.    Reports and Records

96.    Within 120 days from the effective date of this Agreement,
       and every three months thereafter until this Agreement is
       terminated, the City shall file with the Monitor and the DOJ
       a status report, including any supporting documentation,
       delineating all steps taken during the reporting period to
       comply with each substantive provision of this Agreement.

97. The Monitor shall file with the Court quarterly public reports detailing the City's compliance with and implementation of this Agreement. The Monitor may issue reports more frequently if the Monitor determines it appropriate to do so. These reports shall not include information specifically identifying any individual officer. Drafts of all status reports shall be provided to the DOJ and the City at least 10 days prior to publication to afford the parties an opportunity to identify factual errors.

98. During the term of this Agreement, and subject to record retention requirements and procedures imposed by state or local law, the City and the DPD shall maintain all records documenting compliance with this Agreement and all documents required by or developed pursuant to this Agreement. The City and the DPD shall maintain an officer's training records during the officer's employment with the DPD and for three years thereafter.

99. The City and the DPD shall provide the Monitor and the DOJ with full and unrestricted access to all DPD and City staff, facilities, and documents (including databases) that are relevant to evaluate compliance with this Agreement, except any documents protected by the attorney-client privilege and/or work product doctrine. Should the City decline to provide the Monitor or the DOJ with access to a document based on attorney-client privilege and/or the work product doctrine, the City shall provide the Monitor and the DOJ with a log describing the document. The Monitor and the DOJ shall retain any non-public information in a confidential manner and shall not disclose any non-public information to any person or entity, other than a party or the Monitor, absent written notice to the City and either written consent by the City or a court order authorizing disclosure. This Agreement does not authorize, nor shall it be construed to authorize, access to any DPD documents by persons or entities other than the DOJ, the City, and the Monitor.

## XVIII. STIPULATION PURSUANT TO THE PRISON LITIGATION REFORM ACT, 18 U.S.C. § 3626

100. For purposes of this lawsuit only and in order to settle this matter, the City and the DPD stipulate that they have violated the federal rights of inmates as alleged in the pleadings. The parties further stipulate and agree that prospective relief in this Agreement is narrowly drawn, extends no further than necessary to correct the violations of federal rights set forth in the Complaint, is the least intrusive means necessary to correct these violations and will not have an adverse impact on public safety or the operation of a criminal justice system. Accordingly, the

parties agree and represent to the Court that the Agreement
complies in all respects with the provisions of 18 U.S.C.
§ 3626(a), and may serve as the factual and legal basis for
a court order issued pursuant to those provisions.

101. The issue of liability has not been litigated.  The parties
ask the Court to approve this Agreement without a full
hearing on the merits, on the basis of the DOJ's Complaint
and the above stipulation.

102. This Agreement is not intended to have any preclusive effect
except between the parties.  Should the issue of the
preclusive effect of this Agreement be raised in any
proceedings other than this civil action, the parties agree
to certify that this Agreement was intended to have no such
preclusive effect.

## XIX. IMPLEMENTATION AND ENFORCEMENT

103. Within 90 days of the effective date of this Agreement,
unless another time frame is specified in this Agreement,
the City and the DPD shall implement each and every
provision of this Agreement.

104. In regard to any provision that provides for "review and
approval" by the DOJ, approval shall be granted in a timely
fashion provided that the policy, protocol, plan, revision
or other City or DPD action reasonably satisfies the
requirements and standards set forth in the relevant
provision(s).

105. Any revisions to DPD policies shall be provided to the DOJ
within one week of their promulgation.

106. The Court shall retain jurisdiction of this action for all
purposes during the term of this Agreement.  The Agreement
shall terminate two years after the effective date of the
Agreement if the DPD and the City have substantially
complied with each of the provisions of this Agreement and
have maintained substantial compliance for at least one
year.  The burden shall be on the City to demonstrate that
it is in substantial compliance with each of the provisions
of the Agreement and has maintained substantial compliance
for at least one year.  Noncompliance with mere
technicalities, or temporary failure to comply during a
period of otherwise sustained compliance, shall not
constitute failure to maintain substantial compliance.  At
the same time, temporary compliance during a period of
otherwise sustained noncompliance shall not constitute
substantial compliance.

24

107. The parties agree to defend the provisions of this Agreement.  The parties shall notify each other of any court or administrative challenge to this Agreement.

108. Failure by the parties to enforce this entire Agreement or any provision thereof with respect to any deadline or any other provision herein shall not be construed as a waiver of its right to enforce other deadlines or provisions of this Agreement.

109. If any unforeseen circumstance occurs which causes a failure to timely carry out any requirements of this Agreement, the DPD and/or the City shall notify the DOJ in writing within 20 calendar days of the time that the DPD and/or the City becomes aware of the unforeseen circumstance and its impact on the DPD and/or the City's ability to perform under the Agreement.  The notice shall describe the cause of the failure to perform and the measures taken to prevent or minimize the failure.  The DPD and the City shall implement all reasonable measures to avoid or minimize any such failure.

110. In the event the DPD or the City fail to fulfill any obligation under this Agreement, the DOJ shall, prior to pursuing any remedy with the Court, give written notice of the failure to the DPD and the City.  The DPD and the City shall have 30 days from receipt of such notice to cure the failure.  However, if the DOJ determines that an emergency condition exists that places persons at risk of serious and imminent harm, the DOJ may immediately seek a remedial order from the Court.  At the end of the 30-day period, in the event the DOJ determines that the failure has not been cured, the DOJ may, upon three days notice to the City (excluding weekends and federal or state holidays), at its election seek a remedy from the Court.

## XX. MISCELLANEOUS

111. This Agreement shall be posted on the web sites of the City or the DPD and of the Special Litigation Section of the Civil Rights Division of the DOJ.

112. The City and the DPD agree that they shall not retaliate against any person because that person has filed or may file a complaint, provided information or assistance, or participated in any other manner in an investigation or proceeding relating to this Agreement.

IT IS SO ORDERED this 18th day of July, 2003.

_____
UNITED STATES DISTRICT JUDGE

FOR PLAINTIFF:

JOHN ASHCROFT
Attorney General

JEFFREY G. COLLINS
MI Bar # P37260
United States Attorney
Eastern District of Michigan

RALPH F. BOYD, JR.
Assistant Attorney General
Civil Rights Division

PAMELA J. THOMPSON
MI Bar # P26056
Executive Assistant United
States Attorney
Eastern District of Michigan

SHANETTA Y. BROWN CUTLAR
Acting Chief
Special Litigation Section
Civil Rights Division

JUDITH E. LEVY
MI Bar # P55882
Assistant United States Attorney
Eastern District of Michigan
211 West Fort Street
Suite 2001
Detroit, MI 48226
Telephone: (313) 226-9501
Facsimile: (313) 226-4609

MAURA K. LEE
JOHN A. HENDERSON
Trial Attorneys
Special Litigation Section
Civil Rights Division
U.S. Department of Justice
Patrick Henry Building
950 Pennsylvania Avenue NW
Washington, DC 20530
Telephone: (202) 514-6255
Facsimile: (202) 514-4883

FOR DEFENDANTS:


_____
RUTH C. CARTER
Corporation Counsel
City of Detroit

_____
KWAME M. KILPATRICK
Mayor
City of Detroit


_____
BRENDA E. BRACEFUL
Deputy Corporation Counsel
1650 First National Building
660 Woodward Avenue
Detroit, MI  48226-3535
Telephone: (313) 224-4550
Facsimile: (313) 628-0299

_____
JERRY A. OLIVER, SR.
Chief of Police
City of Detroit


Dated: 11 June 2003

28